Robert W. Sadowski
ROBERT W. SADOWSKI PLLC
800 Third Ave, 28th Floor
New York, New York 10022
Tel. No.: (646) 503-5341

*Attorneys for Dr. Tahira Mirza*

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. TAHIRA MIRZA,<br><br>                              Plaintiff,<br><br>          - against -<br><br>ORANGE REGIONAL MEDICAL CENTER, GARNET HEALTH, formerly known as, GREATER HUDSON VALLEY HEALTH SYSTEM, JERRY DUNLAVEY, MBA, DRS. GERARD GALARNEAU, JAMES OXLEY, and MOHAMMAD SIDDIQUI,<br><br>                              Defendants. | Civ. No.:<br><br>**COMPLAINT** |

Dr. Tahira Mirza ("Dr. Mirza") by and through her attorneys, Robert W. Sadowski

PLLC, alleges for her complaint as follows:

## PRELIMINARY STATEMENT AND NATURE OF THE ACTION

1.      This is a civil action brought by Dr. Mirza against the Defendants Orange

Regional Medical Center ("ORMC"), Garnet Health, formerly known as Greater Hudson Valley

Health System ("GHVHS"), Jerry Dunlavey ("Dunlavey"), and Drs. Gerard Galarneau

("Galarneau"), James Oxley ("Oxley"), and Mohammad Siddiqui ("Siddiqui") (collectively

"Defendants").   Dr. Mirza is alleging claims under the retaliation provisions of the Federal False

Claims Act, 31 U.S.C. § 3729(h), the New York State False Claims Act N.Y. Fin. L.§ 191, N.Y.

Labor Law § 741, breach of contract, fraudulent inducement to contract, and violations of New

York State Labor laws pertaining to improper quality of patient care, defamation, tortious interference with contract/prospective business relations, breach of contract, fraudulent inducement, and injunctive relief to cause Defendants to cease and desist disparaging Dr. Mirza, and to recover damages sustained by Dr. Mirza.  Defendants retaliated against Dr. Mirza for her bringing to light and attempting to correct Defendants' violations of the Federal and State False Claims Acts, which resulted in patient harm and abuse and defrauded the Medicaid and Medicare Programs as well as other federally and state-funded programs.  Plaintiff also witnessed and reported to Defendants the neglect of patients and abuse and endangering patients' lives.

2.      In addition, Defendants breached their agreement with Dr. Mirza that they would not take action to harm her in seeking future employment positions, which they continue to do, which actions have not allowed her to mitigate her damages.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a) (False Claims Act), 28 U.S.C. §1331 (Federal Question), and supplemental jurisdiction over the remaining claims.

4.      Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(l) and (2) because at least one of the Defendants resides or transacts business in the Southern District of New York and Defendants reside in New York, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE PARTIES

5.      Plaintiff is Dr. Mirza, who had worked as an Assistant Professor at the University of Connecticut School of Medicine, at Hartford Hospital, a level 1 American College of Surgeons Verified Trauma Center.  Dr. Mirza also trained at Hartford Hospital, where she completed a Traumatology and Emergency Medicine Fellowship.  In addition, she had also

trained at Massachusetts General Hospital for her Surgical Critical Care Fellowship, a teaching

hospital of Harvard Medical School and an affiliate of Harvard University.  She was also dual

board certified in General Surgery and Surgical Critical Care from the American Board of

Surgery.  Dr. Mirza is an instructor of the nationally and internationally known Teaching

Instruction ATOM course, where at Hartford Hospital, she has trained her peers, and other

surgeons (surgeons that came from all over the USA and International Surgeons that came to

take the course, in addition to residents, medical students, PAs, and nurses).  Dr. Mirza has also

taught extensively in the Simulation Labs and instructed and taught residents, medical students,

PAs and nurses.  The ATOM course is recognized by the American College of Surgeons

Committee on Trauma as a teaching tool for Trauma Surgeons and it is a nationally and

internationally implemented tool and was also incorporated by the American College of

Surgeons and recognized by them as a Standard.  The ATOM program is also under the auspices

of the American College of Surgeons Committee on Trauma.  Dr. Mirza's input was

incorporated in the further development and expansion of the ATOM Course.  In addition, she

has trained and worked at Level 1 Trauma centers that had already been accredited by the

American College of Surgeons.  Dr. Mirza also worked as an Attending Surgeon at Beth Israel

Deaconess Medical Center, in the division of Acute Care Surgery, Trauma and Surgical Critical

Care, and which is a teaching hospital of Harvard Medical School and affiliated with Harvard

University and had taught Harvard Medical School students, residents and fellows.  Dr. Mirza

was also an Instructor of Surgery at Harvard Medical School.  Dr. Mirza's title was an Instructor

of Surgery.

6.     Attached hereto as Exhibit A is Dr. Mirza's offer of employment, which she

signed.  Dr. Mirza's contract of employment is attached as Exhibit B.  Dr. Mirza's contract of

employment requires her to notify the Chief Compliance officer of any violation of applicable law, and requires her to comply with, *inter alia*, the Federal and State False Claim Acts and New York Labor Law §§ 740 and 741, and all State and Federal whistleblower requirements.

7.      Defendant Orange Regional Medical Center is the hospital/medical center serving Orange County and the surrounding area.

8.      Defendant Garnet Health ("GH") is a health care provider in the greater Hudson Valley and successor to GHVHS.

9.      Defendant Jerry Dunlavey, MBA, is the Vice President/Executive Director of GH and administrative supervisor of Dr. Mirza.

10.     Defendant Dr. Gerard Galarneau is President of GH.

11.     Defendant James Oxley D.O., is the Chief Medical Officer of ORMC.

12.     Defendant Dr. Mohammad Siddiqui is Chief of Trauma Surgery at ORMC.

## THE LAW

**A.      The Federal False Claims Act Relief from Retaliatory Actions.**

13.     Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

14.     Relief shall include reinstatement with the same seniority status that employee, contractor, or agency would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including but not limited to litigation costs and reasonable attorney's fees.

4

31 U.S.C. § 3730(h).

**B.     The New York State False Claims Act Protection from Retaliation**

15.     Any current or former employee, contractor, or agent of any private or public employer who is discharged, demoted, suspended, threatened, harassed or in any other manner discriminated against in the terms and conditions of employment, or otherwise harmed or penalized by an employer, or a prospective employer, because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action brought under this article or other efforts to stop one or more violations of this article, shall be entitled to all relief necessary to make the employee, contractor or agent whole.  Such relief shall include but not be limited to:

(a)     An injunction to restrain continued discrimination;
(b)     Hiring, contracting or reinstatement to the position such person would have had but for the discrimination or to an equivalent position;
(c)     Reinstatement of full fringe benefits and seniority rights;
(d)     Payment of two times back pay, plus interest; and
(e)     Compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

**C.     New York Labor Law § 741**

16.     New York Labor Law provides that "no employer ['who provides health care services in a facility'] shall take retaliatory action against any employee who does any of the following:"

(f)     Discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or
(g)     Objects to or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care.

## FACTS

**A.      Background and Hiring.**

17.      On September 30, 2017, Dr. Mirza accepted the letter of intent describing the offer of employment signed by Dunlavey on behalf of GHVHS.  The offer was for a full-time position as Trauma and Acute Care Surgeon at GHVHS Medical Group. P.C., assigned to ORMC.  The contract was for a two-year term with base compensation of $475,000.00 per year, plus a $10,000 sign-on bonus, payable in two installments, and a $10,000 retention bonus.  The package also included a productivity bonus of up to $25,000.  The offer included a benefits package including 30 days of accrued paid time off per year, as well as other valuable benefits.  Dr. Mirza was also contractual promised reimbursement for relocations expenses, which were never paid.

18.      Dr. Mirza commenced her work at ORMC on January 8, 2018, which was the second day of orientations at GHVHS, which continued on January 8 through 11, and also on January 15, 2018.  Before Dr. Mirza started her employment, Dr. Mirza was also provided the ORMC Medical Staff Bylaws ("Bylaws"), the GHVHS Medical Group, PC, Employee Handbook ("Handbook"), and the GHVHS Code of Conduct & Compliance Plan ("Compliance Plan").

**B.      Dr. Mirza Engaged in Protected Activity to Expose Billing Fraud, and Patient Care Neglect, Harm, and Abuse in Violation of the False Claims Acts and other Federal and State Laws.**

19.      Dr. Mirza has evidence of several fraudulent billing schemes, which she brought to the attention of ORMC.  These fraudulent billing schemes raises at least two kinds of disparate causes of action:  (1) false claims acts violations on behalf of the federal and state governments, and also (2) a whistleblowing cause of action for retaliation.  This complaint includes some but

not necessarily all of the instances of billing fraud and patient neglect, harm, and abuse that Dr.

Mirza is raising.

       **1.**      **Upcoding to Critical Care.**

      20.      Dr. Mirza has evidence of an upcoding scheme. This complaint includes

reference to some but not all of the instances of upcoding that Dr. Mirza raised.

      21.      During orientation on January 11, 2018, at 8:00 to 10:00 a.m., Dr. Mirza attended

a meeting entitled "Medical Group Revenue Cycle, Charge Capture and Epic Billing."  The

Associate Director of Hospital Medicine Dr. Adrian Paraschiv moderated the meeting, also

present were Coding Educator/Analyst-Physician Practice Coding Supervisor, GHVHS, Ms.

D'Angela Ravenell, BS, CPS, CDEO.  Ms. Ravenell discussed how the physicians should bill for

all new trauma patient visits in the Emergency Department ("ED"), and instructed Dr. Mirza to

preemptively use both CPT Code 99291 for the first 30 to 74 minutes, and 99292, which is the

add on code only to be used for each 30 minutes of **critical care**, which is reimbursed at a much

higher rate than the non-critical care history and physical visit codes, which reimburse at a lower

rate.  Through this instruction, Ms. Ravenell directed physicians to preemptively up code to

critical care codes all claims for reimbursement from the ED.

      22.      Dr. Mirza informed Ms. Ravenell and Dr. Paraschiv that not all new patients

presenting in the ED qualified for critical care codes 99291 and 99292.  Dr. Mirza further added

that the majority of new admissions to the ED would only qualify for the regular history and

physical codes, which are billed at a lower rate.  Dr. Mirza informed Ms. Ravenell that

preemptively billing all new patients with the critical care codes was improper.  Ms. Ravenell

replied, "Dr. Siddiqui bills all ED visits with the 99291."  Dr. Mirza responded that "not all of

the ED Trauma Activation visits could be eligible for the 99291," and that she would not do that because it would be considered fraudulent billing.

23.     Moreover, any time a patient is seen either as a Trauma Activation or a Trauma Consult, the physician assistants write the initial note, which becomes part of the medical record, and that documentation has to support the level of the billing code that is submitted.  The record is then sent to the attending physician to complete the physician section, who also verifies the accuracy of the physician assistant note.  However, in addition to the physician assistants' consult or history and physical notes, the physician assistants also routinely preemptively primed the note with a paragraph for critical care billing stating that critical care was provided, the reason for the critical care, and the minutes of critical care provided.  The physician assistants sent their notes to Dr. Mirza for every patient seen in the ED with either a Trauma Activation or a Trauma Consult with the paragraph in the note that critical care was provided, the reason, and the time, regardless of whether critical care was provided.

24.     When Dr. Mirza started seeing this pattern in every physician assistant note, she started correcting the physician assistants, however some persisted even when corrected.  Dr. Mirza had to routinely delete the physician assistant paragraph for critical care when none was provided, and insert the appropriate billing code.  If Dr. Mirza had not corrected and omitted the paragraph in the critical care notes written by physician assistants, a fraudulent bill would have been submitted for a higher rate of reimbursement.  Dr. Mirza has evidence supporting this claim.

**2.   Systemic Double Billing.**

25.     Dr. Mirza has evidence of a double billing scheme. This complaint includes references to some but not all of the instances of double billing that Dr. Mirza raised.

8

26.     There consistently was systemic double-dipping fraud for reimbursement claims ongoing at GHVHS/ORMC.

27.     The majority of General Surgery patients presenting to the hospital for a surgical problem were admitted to a Medicine Service (a/k/a Hospitalist Service), with General Surgery on consult.  By admitting patients by the Hospitalist, a high-level history and physical E/M code was billed by the Hospitalist for the admission with an additional corresponding consult note billed by Surgery.  Thus, two bills/claims for reimbursement—Hospitalist and Surgeon—were submitted to Government on the same day of service, when only one, *i.e.,* Surgery (because the patient was admitted for a surgical problem) should have been submitted.

28.     After the admission, more fraudulent double billing occurred; two bills were submitted for daily visits during daily rounds, one by the Hospitalist and one by the Surgeon, when only the Surgeon daily visit should have been billed for the daily visit.  For a patient who presented for a surgical problem, but admitted by Hospitalist Service, two bills were generated every day for daily visits up to the time of discharge.  If the patient actually underwent surgery, Surgery stopped billing for daily visits, because surgery billing is bundled, but the fraud continued daily by the Hospitalist in the post-operative period.

29.     Hospitalists were improperly using patient's existing medical conditions to create a problem list for active issues when these issues were pre-existing and were not the cause of the presentation to the hospital.  The way GHVHS/ORMC does this is by the following mechanism: Any time a General Surgery patient presents to the ED for an active general surgery disease process (*e.g.,* complicated appendicitis, acute cholecystitis, gallstone pancreatitis, gallstones with biliary colic, strangulated hernia, incarcerated hernia, diverticulitis, abscess, duodenal ulcer perforation, or small or large bowel obstruction), the ED physician would consult both the

9

Hospitalist (Medicine Team) and General Surgery simultaneously to ensure both services would be consulted at the start of presentation.  By the time the General Surgery physician arrived in the ED to evaluate the patient, the Medicine Team would have already admitted the patient or be in the process of doing so, or the ED attending would inform the Surgery team that the Hospitalist would admit, with General Surgery as a consulting service.  The majority of these patients presenting with general surgery disease should have been admitted to only Surgery. This scheme played out as a daily occurrence.

30.     In addition, there is fraudulent billing for post-operative general surgery patients, who presented to the hospital for a re-admission from a complication of the surgery. These patients had recently been discharged from the hospital and were in their global period, when the reimbursement for follow-up services related to the surgery are captured by the prior bundled surgery bill.   However, instead of being re-admitted to General Surgery, these patients were re-admitted to the Hospitalist Service. This was done so that a fraudulent bill could be submitted by the Hospitalist, since the operating surgeon/General Surgery could not bill for this patient, due to the patient being in the global period.

31.     For example, although, a few general surgery patients were admitted directly to Surgery by Dr. Siddiqui and other surgeons, documents show that the majority of patients presenting with general surgery disease were admitted by a Hospitalist with Dr. Siddiqui, and other surgeons on consult.  The review of incidences of patients presenting with acute surgical emergency, but admitted by Hospitalist Service, with a Surgery Service consult shows an excessive systemic pattern.  The ACS has capped the medical admission of trauma patients at 10%.  That is all trauma patients have to be admitted to a Surgical Service, such as Trauma, Orthopaedic Surgery, or Neurosurgery, *etc.*  Dr. Mirza overheard a discussion between a

Hospitalist and a resident, when the Hospitalist actually referred to the practice of "double dipping" in connection with wanting to get a patient off his hands.

**3.      Systemic Violations of the "Medicare Two-Night Rule" and Inpatient Stay of 3 days.**

32.      Dr. Mirza has evidence of a scheme of violations of the "Medicare Two-Night Rule."  This complaint includes a reference to some but not all of the instances of the violations of the "Medicare Two-Night Rule" that Dr. Mirza raised.

33.      GHVHS/ORMC systemically violate the Medicare "Two-Night Rule." https://www.the-hospitalist.org/hospitalist/article/194971/medicares-two-midnight-rule.

34.      A documented example of the violation of this rule is as follows:  Documents from May 29, 2018, show that this was a theme.  A patient with Dr. Mirza's handwritten notes state "3 night" and her note for "discharge" is crossed out.  This patient was admitted on May 27, 2018, and ready for discharge before 3-nights' stay had been met.  On morning rounds on May 29, 2018, discharge planners insisted that the patient needed to stay three nights before she could be discharged.

35.      As another example, that occurred on May 29, 2018, the note states in sum and substance that the patient ambulated 150 feet with Physical Therapy, and recommendations are to discharge home, but patient fees unsafe and wants Rehab-Acute rehab order placed.  This patient was cleared for discharge on 5/28, and there is no noted medical need for keeping the patient.  On the handwritten note, discharge is crossed off, and that patient will stay the night of 5/29/2028 to qualify for SNF.

36.      This fraud scheme is executed as follows:  Medicare reimburses under Part A and Part B.  "Under Medicare, defining a hospitalization as inpatient versus outpatient is especially important because they are billed to different Medicare programs (Part A for inpatient, Part B for

11

outpatient), and both hospital reimbursement and patient liability can vary significantly."
"Observation stays—under 2 nights, are billed under Part B, under which the beneficiary
generally has a 20% copay."

37.     To qualify as "inpatient" and the reimbursement billed under Part A, the patient
must have stayed for 2 midnights at the hospital.  If the stay at the hospital is less than 2
midnights, the admission is deemed an observation (even though the patient was admitted in the
hospital and stayed a night, Medicare counts it as observation status).  So, in order to avoid the
lesser reimbursement for observational stays billed under Part B and bill under the higher rate
provided under Part A, ORMC keeps the patient in the hospital, without medical necessity, for 3
nights, which is fraud.

38.     "In addition to the differences in cost sharing, hospital admission status can also
affect a beneficiary's eligibility for other services.  One of the requirements necessary for
Medicare to cover a stay in a skilled nursing facility ("SNF") is that the beneficiary must have
had an inpatient hospital stay of at least three days prior to admission to the SNF."
https://www.healthaffairs.org/do/10.1377/hpb20150122.963736/full/.

39.     The medically unnecessary three-night stay has huge financial benefits for three
parties: (1) ORMC is able to bill under Part A, receiving a higher reimbursement for the DRG at
inpatient rates.  (2) The patient pays a lower co-pay, giving the hospital less risk that a
financially distressed patient is unable to pay the co-pay, and the patient has the rehabilitation
stay at an SNF covered by Medicare.  (3) The SNF also has received a patient with Medicare
reimbursement.

40.     Dr. Mirza has instances of patients who, for example, in the geriatric age group,
may not medically qualify for a stay beyond 2 nights, but either may need some days of

12

assistance either because they are not steady on their feet, or do not have support at home.  If there is no medical reason for the admission to be justified beyond 2 nights, Medicare will not reimburse the stay as an inpatient, *e.g.,* a minor injury.  However, the hospital cannot discharge a patient who is unsteady and lacks support at home.  The inability to discharge prolongs the hospital stay, with no reimbursement because there is no medical necessity.  ORMC's system is set up at the initiation of the stay and throughout to recommend physical therapy, and the provision of care—often with physicians unknowingly justifying the stay by relying on physical therapy to clear the patient, for a discharge after the third day, in medical notes.

41.     To induce physicians to keep patients in the hospital and not discharge the patient, ORMC uses case managers/discharge planners, who are the personnel who contact insurance carriers and determine what a patient's benefits provide and physical therapy supervisors.  Dr. Mirza noticed that more time was spent discussing patient disposition, insurance, and discharge planning during the morning sign out report than discussing actual patient care.  Dr. Mirza objected to the practice of having two or more supervisors of case workers and discharge planners, and physical therapy at every daily sign out report.

42.     In fact, Dr. Mirza observed that as the staff went down the patient list during the morning sign out, the discussion of medical issues was curtailed in order to give discharge supervisors time to speak on each patient—addressing whether the patient had insurance, what benefits the patient had, how many days of the Medicare-inpatient stay had been used up, the push to discharge the patient by the fourth day, and preventing discharge until the three-night stay was met.  Dr. Mirza objected to the four-day limit on all patients, and particularly trauma patients, who often required long stays.  To discharge all patients under the four-day limit would not constitute the proper standard of care, for those patients who were not medically ready to be

discharged and improperly discharging those patient early who required a longer length of stay at the hospital, would be exposing these early discharged patients to harm and risk.

43.     Dr. Mirza received significant push back, with statements by case managers that "we are very good on keeping the four-day rule."

44.     Dr. Mirza asked Dr. Siddiqui why the team had to meet with these two to three supervisors, who were present daily, because they were taking up valuable time needed to discuss patient medical issues.  In fact, Dr. Mirza explained that at prior hospitals where she worked discharge planners met with physicians once a week, not daily.  Dr. Siddiqui was adamant that the discharge supervisors had to be at the daily morning sign out meeting.

**C.     Systemic Failure of Patient Quality of Care in Violation of State Laws.**

45.     In addition to the fraudulent billing schemes, Dr. Mirza has evidence of a systemic failure of patient quality of care and unsafe medical practices. This complaint includes references to some but not all of the instances of violations of quality of care and unsafe medical practices that Dr. Mirza is raising.

46.     From January through May 2018, Dr. Mirza objected to improper quality of care practices and brought improper patient care to Dr. Siddiqui's attention on a recurring basis on morning rounds.  These unsafe medical practices raise at least two kinds of disparate causes of action: (1) a whistleblowing cause of action; and (2) contract violation.

47.     Dr. Siddiqui routinely instructed trauma attendings and physician assistants to refrain from following proper patient management protocols, which constituted deviations from the standard of care.

48.     On the sixth day of orientation, January 15, 2018, Dr. Siddiqui oriented the new trauma surgeons on how the division of Acute Care Surgery and Trauma worked at ORMC, and which specialties were taking calls for Trauma.  Dr. Siddiqui informed the new trauma surgeons

that there was no vascular surgery coverage for trauma patients at ORMC. There was a vascular surgery group practice in Middletown, but they did not cover trauma cases, and if trauma surgeons needed to get coverage for patients with a vascular injury, then they could give the vascular group a call and see if they would like to be consulted, and if they would assume care for the vascular injury.  Here, where there is no vascular surgery on the call schedule, the private vascular surgeons have no obligation to assist with that patient and they can refuse to participate in the care.  Dr. Siddiqui instructed the new trauma surgeons to check with the private vascular surgeons in the community, and if they refused to assume care, then to take these very same patients (with a vascular injury that required the expertise of a vascular surgeon), to the operating room and operate on them.  Meaning, Dr. Mirza should take the patient and attempt a vascular surgery operation, for which she was not trained and neither was it her specialty.  Dr. Siddiqui also instructed the new trauma surgeons to operate on these vascular injury patients, and put shunts in place, which is a temporary procedure, and then assess what to do the next day.

49.     Dr. Siddiqui's deviations from the standard of care included instructing surgeons to operate outside the scope of their practice as trauma and general surgeons and take on vascular surgery cases, which should necessarily be done by a vascular surgeon.  This is a violation of the rules of the American College of Surgeons, which require that these cases be transferred out specifically to a vascular specialist, and as such, Dr. Siddiqui's grossly reckless instructions were risking the safety of these patients.  For trauma verification purposes for a Level 2 status by the ACS, vascular surgery should be taking calls or such kinds of patients should be transferred out. Dr. Mirza informed Dr. Siddiqui that she would not be taking these patients with vascular injuries, to the operating room and would not be operating on them, as a trauma and general surgeon is not trained to carry out vascular operations, but requires a vascular fellowship-trained

surgeon.  Dr. Siddiqui informed the new trauma surgeons to call him instead, and that he would come to the hospital and would assist in the operating room for these vascular injuries.  Dr. Siddiqui lived about an hour away from the hospital, so if that had been done, the patient would have suffered harm from hemorrhage while waiting for Dr. Siddiqui to arrive.

50.     Treating these injuries is not in the scope of practice of a general surgeon with additional training in Trauma and Surgical Critical Care, which was Dr. Mirza's specialty, but specifically require a vascular fellowship-trained surgeon.  Dr. Siddiqui's instruction to operate on patients with injuries which were outside the scope of the practice of trauma surgery, was highly dangerous, which would definitively lead to patient harm. This was also a reckless attempt to show the ACS that ORMC was self-sufficient and that the trauma surgeons were able to manage vascular injuries, because had there been vascular injuries and these patients had been transferred out, it might have placed obtaining the Level 2 Trauma status in jeopardy.

51.     Dr. Siddiqui's instructions to refrain from following proper patient management protocols also included routinely directing physicians to not give intravenous fluid to patients who had orders for "nothing per oral" ("NPO"), because the patient was waiting for an operation and had to stop eating and drinking within a number of hours before surgery.  However, to support these patients and maintain the fluid requirements, the patients should be given fluids intravenously.  Young patients with traumatic injuries, including fractures, soft tissue injury, hemorrhage from solid organ injury, and particularly older trauma patients are susceptible to the effects of dehydration caused by a lack of intravenous fluids.  The potential results of dehydration are heart attack (myocardial infarction), stroke, kidney damage, delirium, seizure, electrolyte imbalance, blood clot formation, and pulmonary embolism, as well as other complications.

16

52.     Trauma patients tend to be already dehydrated because of the trauma disease process and loss of fluids, so deliberately further dehydrating them and unnecessarily exposing them to these risks was an unacceptable and harmful practice.  When Dr. Mirza raised this issue, Dr. Siddiqui either failed to listen or simply shut Dr. Mirza down.

53.     In another example of the failure of patient care, Dr. Siddiqui routinely instructed physicians in rounds and morning sign-out meetings to not replace or check daily the electrolytes (*e.g.* magnesium, calcium, and phosphorus) of patients in the Intensive Care Unit ("ICU").  In fact, Dr. Siddiqui specifically directed Dr. Mirza not to check electrolyte levels, and if the level had been checked and found low, he would not allow replacement of deficient electrolytes.

54.     Dr. Mirza, however, did replace deficient electrolytes intravenously and issue orders for replacement.  For patients admitted in the ICU, fluid and electrolyte disorders are among the most common clinical problems encountered, causing muscles weakness, disturbances in cardiac rhythms, and low phosphorous levels, which is associated with respiratory failure, and optimal phosphorus levels are necessary to wean patients from mechanical ventilation.

55.     Dr. Siddiqui routinely discouraged MRIs of the cervical spine for trauma patients, to save ORMC money that would be collected with the DRG payment system.  Once, while covering for him, Dr. Mirza ordered a necessary CT scan of the chest, abdomen, and pelvis for a geriatric trauma patient ("Patient 1"), who was prescribed a blood thinner and who was on the blood thinner.  Dr. Siddiqui cancelled these CT scans committing malfeasance.  When Dr. Mirza protested that intra-abdominal bleeding was possible, he replied "if there are no bruises on the abdomen, the CT was not needed."  Missed injuries can result in significant morbidity and mortality risks for the patients.  If this patient were bleeding internally, the blood loss would only

come to light if the patient had blood work done the next day which revealed a drop in hemoglobin/hematocrit count. This blood loss poses serious risks of loss of consciousness, heart attack, or cardiac arrest from the hemorrhage, which might be ongoing and undetected.

56.     Dr. Siddiqui routinely gave lectures to the trauma department to refrain from seeking consultations from Medical Services team members, despite the fact that such consultations are necessary for patients with medical conditions other than the trauma injuries for which they had been presented to the hospital.

57.     Dr. Siddiqui's potential harm to patients is established by this example: A patient ("Patient 2"), who was being treated by Dr. Mirza developed blood clots (deep venous thrombosis) in both legs, which was diagnosed on 01/20/18 on duplex. The patient had sequential compression devices on both of his legs, which were prescribed to prevent clots. The patient, however, did develop clots in both of his legs. It is standard practice and directed by the manufacturer of the compression device's own instructions that the device be removed once a clot formed. On 01/22/2018, Dr. Mirza thus directed the compression device to be removed, which order Dr. Siddiqui jumped to counter. Dr. Mirza explained to Dr. Siddiqui that the reason, as the manufacturer and medical literature directs, is that the presence of the clots with continued compression device application can pushed the clot to the heart. Dr. Siddiqui, in the face of this established medical fact and standard of care, replied that "that does not happen." Once Dr. Mirza reached the patient's floor for rounds, Dr. Mirza directed the physician assistant and nurses to remove the device—both gave push back to the order, so Dr. Mirza directed them to consult the medical literature.

58.     Deep venous thrombosis (clots) prophylaxis (prevention) was routinely held off on instructions of orthopedic surgeons, and this holding off of such prophylaxis was enforced by

Dr. Siddiqui and one such patient had a code (cardiac arrest on 05/18/2018) and died post operatively as her DVT prophylaxis had been withheld.

59.     Clots form in veins in a higher percentage in trauma patients. To prevent the clots from forming prophylaxis (prevention) is done with medications either heparin or lovenox.  At ORMC, the orthopedic surgeons would prevent the medications from being given pre-operatively and post-operatively, which can result in complications causing morbidity and even death for patients.  One such patient, Patient 3, with a left subtrochanteric hip fracture was admitted on 05/16/2018, and had her operation on 05/17/2018.  She had a cardiac arrest after surgery and died on 05/18/2018.

60.     The physician assistant had discontinued her DVT prophylaxis (even though Dr. Mirza had not asked them to discontinue it on 05/17/2018 when she had also been on call), and the patient did not receive a dose of her prophylactic medicine on 05/17/2018 or on 05/18/2018. This is not the standard of care; according to the standard of care these medications are routinely given daily even for pre-operative or post-operative patients.

61.     Another example of Dr. Siddiqui's potential harm to patients occurred on May 13, 2018, ("Patient 4").  Patient 4 already had a chest tube placed (for a Hemo-pneumothorax) by another attending (chest tube #1 on 05/08/2018).  On May 12, 2018, chest tube #1 was still in place because the pneumothorax had not resolved and was being followed by chest x-rays.  Dr. Mirza was on call on May 12, 2018, when Patient 4's condition deteriorated in the ward.  The patient became hypotensive (low blood pressure) and developed tachycardia (fast heart rate).  A chest x-ray showed an increase in the size of the pneumothorax (*i.e.* worsening of the original pneumothorax).  Based on these findings, Dr. Mirza immediately placed a second chest tube on the same side of the chest, in the ward.  (This is consistent with the standard of care, as a

pneumothorax currently undergoing treatment with one chest tube can still require a second chest

tube if the first one fails to do its job, and here, it was evident as the size of the pneumothorax

had increased on chest x-ray and the patient was worsening clinically with low blood pressure

and a fast heart rate, which are clinical signs of a pneumothorax).  The patient had a release of air

when Dr. Mirza performed the procedure, and at once, the patient's vital signs improved as she

was on a monitored bed and Dr. Mirza saw the patient's blood pressure improve and heart rate

decrease.  This indicated that the pneumothorax which had worsened on chest x-ray was the

cause of the low blood pressure and fast heart rate.  The gush of air also signified that there was

air accumulating in the chest cavity, (*i.e.*, the first chest tube was not doing its job in taking the

air outside the chest) and its release with the second chest tube placement revealed that the new

tube was needed, as the patient improved clinically at once.

62.     The next morning, May 13, 2018, Dr. Siddiqui started his tirade against Dr. Mirza

regarding this patient during the morning sign-out report.  Dr. Siddiqui started questioning the

necessity of why a second chest tube was placed and upon hearing the events that transpired

which led to the chest tube being placed, actually said that it had not been necessary to place the

second chest tube.  Dr. Mirza explained to Dr. Siddiqui that it was clearly indicated and obvious

that a second chest tube was necessary because the patient's clinical condition had deteriorated

and there was objective evidence in the form of a chest x-ray that had revealed the increase in

size of the pneumothorax.  Dr. Mirza also informed Dr. Siddiqui that the patient's condition had

improved right after the procedure.  Dr. Mirza, was actually being undermined and criticized for

doing the right thing.  What Dr. Siddiqui was instructing was that Dr. Mirza should not have

placed the second chest tube, and this would have caused patient harm, and Dr. Siddiqui was

promoting negligence.

63.     On May 15, 2018, Dr. Mirza was on trauma call.  Dr. Mirza was paged for a trauma patient in the ED.  In fact, two trauma patients were admitted to the ED.  Dr. Mirza handled one patient ("Patient 5") and another physician handled the other patient ("Patient 6"). As the trauma surgeon on call, Dr. Mirza is responsible to evaluate all trauma activations and trauma consults requested by the ED or other services.  Dr. Mirza as the trauma surgeon has primary responsibility for the trauma patients that were paged out on the beeper as Trauma Activations or Activated Trauma, and on all requested trauma consults.

64.     Patient 5 was in a motor vehicle crash having been T-boned on the driver's side. Dr. Mirza ordered a Pan scan, which includes a head CT, CT of cervical spine, and CT of chest abdomen and pelvis.  These tests were medically necessary and the proper standard of care for Patient 5, who presented by virtue of the T-bone crash with the need to rule out aorta injury by a CT of his chest.  Patient 5 also presented with spine pain at T-8 level and left side pelvic pain, which required evaluation with a CT of abdomen and pelvis.  Patient 5 had suffered loss of consciousness, which required evaluation by a CT of the head.  Fortunately for Patient 5, the scans came back negative, but lab results evidenced pancreatitis.  Accordingly, because of the evidence of pancreatitis, the CT of the abdomen was necessary.  Dr. Siddiqui criticized Dr. Mirza falsely on May 16, 2018, that the scans were unnecessary, because they came back negative, however, the standard of care required that they be performed because the patient had indications to have the scans performed.  As Dr. Siddiqui should have been aware, a *post hoc* negative result to a test does not negate the necessity of having that test done in the first place, as the determinative criteria for ordering a test cannot logically be its *post hoc* result.

65.     Patient 6 was a driver that T-boned another motor vehicle.  Patient 6 presented with loss of consciousness, requiring a head CT, had a painful right forearm that was a right

distal radius fracture, and Patient 6 appeared to be intoxicated or concussed on Dr. Mirza's

evaluation.  Another physician had ordered a head and cervical spine CT scan, but he missed the

fracture as a distracting painful injury, and that the intoxicated/concussed condition of Patient 6

rendered the physical examination of the patient unreliable on two counts, one because of the

distracting pain in the forearm and the appearance of either intoxication/concussion.  Dr. Mirza

ordered CT scans of chest, abdomen, and pelvis to rule out intra-thoracic and intra-abdominal

injuries, which was the standard of care, because all of these diagnostic studies were medically

indicated.  Luckily for Patient 6, the chest, abdomen, and pelvic scans came back negative.  Dr.

Mirza again was falsely criticized by Dr. Siddiqui on May 16, 2018, for ordering the scans, on

the basis that the results were negative.  However, this *post facto* rationale does not negate the

necessity of the scans—a doctor cannot preemptively determine the condition before the scan is

done, when the scan was indicated as medically necessary.  Defendants alleged position would

put patients at risk when diagnostic tests are medically indicated, but not performed.

66.     Shortly after Patients 5 and 6 arrived on May 15, 2018, two more trauma patients

arrived, Patients 7 and 8.  Patient 7 had multiple injuries including pneumothorax (collapsed

lung), which required a chest tube to drain the air.  Dr. Mirza granted another physician's request

to have his resident perform the insertion of the chest tube to drain the air.  Dr. Mirza supervised

the resident, who required multiple corrections on how to prep the patient, drape the patient,

execute the technique, know the landmarks of the chest, sew the wound, and secure the tube to

the patient's chest wall.

67.     Patient 8 had been initially worked up by another physician, who had ordered a

head and cervical spine CT scan.  Patient 8's mechanism of injury was a 25-foot fall.

Accordingly, Dr. Mirza added a CT of chest, abdomen, and pelvis to rule out injury to the aorta

and solid organs in a fall from such height.  On examination, Patient 8 also presented with spine

pain.  Spine pain has to be evaluated with a CT scan of the chest, abdomen, and pelvis to image

the thoracic and lumbar spine.  Another physician had missed both the mechanism of injury and

the spine pain, both of which required a CT scan of the chest, abdomen, and pelvis.   The scans

showed a lumbar spine fracture.  Anytime there is a lumbar spine fracture, the thoracic spine

must be imaged to rule out a concurrent thoracic spine fracture that will be detected on a chest

CT.

68.     In addition to the violations of the standard of care that were routine practice at

ORMC/GHVHS that have been discussed *supra*, the false complaints and pretextual accusations

that ORMC/GHVHS carried out against Dr. Mirza in retaliation to her whistleblowing, as

discussed *infra*, whereby Dr. Mirza was criticized for following the standard of care and was

instructed to deviate from it, also constitutes not only retaliatory actions of a concerted scheme of

harassment but additionally constitute a violation of the standard of care itself.

### D.     False Complaints, Pretextual Accusations, and Retaliation, in Response to Dr. Mirza's Whistleblowing, Refusal to Participate in Fraud Schemes, and Refusal to Compromise Patient Safety.

69.      Dr. Mirza had engaged in whistleblowing and protected activity against

fraudulent upcoding and against violations of patient quality of care by GHVHS/ORMC from the

outset of her employment.  Dr. Mirza's whistleblowing and protected activity includes, but is not

limited to, the following instances:  On January 8, and May 29, 2018, Dr. Mirza objected to the

4-day discharge rule.  On January 11, 2018, Dr. Mirza objected to fraudulent upcoding and

refused to participate in it.  From January through May 2018, Dr. Mirza objected to numerous

improper quality of care practices and brought improper patient care to Dr. Siddiqui's attention

on a recurring basis on morning rounds from between 8:00 a.m. and 10:00 a.m., and, also

including but not limited to, the following dates specifically:  January 15, 2018, January 22,

23

2018, May 13, 2018, May 16, 2018, May 22, 2018, May 23 2018, and eventually to Dr. Oxley on May 24, 2018.

70.     On January 8, 2018, (during orientations) between 1:00-5:00 p.m., there was a meeting titled Medical Staff and Medical Group New Provider Orientation, under which several items were discussed by hospital personnel.  Debbie Lasch moderated the meeting.  A staff member came to discuss "System Case Management," to address case management, and she informed the physicians that patients had to be discharged on the fourth hospital day—meaning that for patients being admitted to the hospital physicians had to discharge them on the fourth day of the hospital stay.  Dr. Mirza told this person, that this 4-day stay would not apply to the trauma patients, whose stay is often more than four days, and that many trauma patients would not be ready for discharge at the completion of four days, to which she replied that, "we are very good on keeping the four-day rule."

71.     On the morning of May 16, 2018, Dr. Siddiqui asked about the previous day's trauma call, which had been busy.  Allegedly, the ED Medical Director had made complaints about Dr. Mirza that she was ordering scans that came back as negative.  Later that day, Dr. Siddiqui called Dr. Mirza to berate her for ordering the scans excessively, and stating that they were coming back as negative but at the same time acknowledged that the ED attendings are overly sensitive about having orders overridden that they perceive as infringing on their territory. Dr. Mirza told Dr. Siddiqui to review the charts from the prior day, which showed that all the scans were medically necessary.  Dr. Siddiqui even admitted that Dr. Mirza was right, but still instructed that diagnostic scans be limited.  Accordingly, Dr. Siddiqui, despite admitting that the scans were correctly ordered, knowingly persisted in insisting that scans be limited to the detriment of patient health and safety and result in patient harm.

72.     Given that Dr. Siddiqui's tirade regarding the scans had been exposed as groundless, he then attempted deflection by telling Dr. Mirza during the same telephone conversation that she was "micromanaging the residents and PAs."  When Dr. Mirza explained the necessity of her correcting the errors the resident was making on Patient 3 with chest tube insertion, Dr. Siddiqui replied, "there has to be a happy medium."  Dr. Mirza replied that the standard of care is an objective concept that does not involve seeking a "happy medium," where a compromise that might placate a resident and prevent complaints from them, breaching the standard of care is not the means to teach or boost morale of residents.

73.     During this telephone call, Dr. Siddiqui in effect advised that Dr. Mirza be a stand-by observer and not change the orders of ED physicians.  What Dr. Siddiqui was asking is for Dr. Mirza to disregard the failures of physicians to order medically necessary tests—at the cost of patient safety and actively engaging in improper quality of patient care, and presenting a substantial and specific danger to public health and safety, because what Dr. Siddiqui was asking is to intentionally avoid diagnosing an injury that could cost the patient significant morbidity, delayed diagnosis, and even death.  In effect, Dr. Siddiqui was forbidding Dr. Mirza from performing her duties and responsibilities as a physician to the detriment of patients' health and safety.

74.     On May 21, 2018, Dr. Mirza was called to the ED by the ED physician on call to assist him.  Dr. Siddiqui also phoned Dr. Mirza to go to the ED.  Earlier in the day, the Patient 9 had a lung biopsy by radiology at ORMC and was discharged, but returned to the ED with shortness of breath.  A chest x-ray revealed a pneumothorax (collapsed lung), which was a complication of the biopsy.  Patient 9 was an established patient of the thoracic surgeon on call, who had already been contacted by the ED physician on call regarding the complication of the

pneumothorax, for which the thoracic surgeon did not come to the hospital to manage, but instead told the ED physician on call to place the chest tube.

75.     The ED physician on call had attempted to insert a chest tube, but created a large wound (depth of 10 cm, length of 5 cm, and width of 2 cm), in an improper location, and had injured a tributary of the right axillary vein causing profuse bleeding.  Dr. Mirza paged the thoracic surgeon on call, Patient 9's treating physician, and who was also on call, but the thoracic surgeon refused to come to the hospital to treat his patient for the second complication of bleeding caused by the ED physician on call.

76.     Dr. Mirza inserted the chest tube correctly, then took the patient to the operating room, and operated on the patient to gain control of the hemorrhage and ligate the vein and close the wound.  The next morning on May 22, 2018, Dr. Mirza met Dr. Siddiqui, who asked about Patient 9's procedure.  Dr. Mirza told Dr. Siddiqui of the botched attempt by the ED physician on call, the refusal of the thoracis physician on call to attend to his patient, and overall the systemic failure to address the improper quality of care on multiple levels.  Dr. Siddiqui minimized the incident and systemic problems with patient care, which was regularly placing patients in risk of injury and harm.  Dr. Siddiqui was not concerned that improper quality of patient care had been provided despite being informed about it.

77.     The next day, on May 23, 2018, Dr. Siddiqui telephoned Dr. Mirza to engage in a painfully aggressive tirade, and reprimanded Dr. Mirza about a laparoscopic procedure on Patient 10.  Dr. Siddiqui made two false accusations, although he was not present in the operating room.  First, Dr. Siddiqui falsely stated that Dr. Mirza repeatedly called the procedure "difficult."  Second, Dr. Siddiqui falsely asserted that Dr. Mirza did not know how to operate the monitor that shows the carbon dioxide gas pressure in the abdomen, which pressure is used to

distend the abdomen to allow the surgeon to view the procedure through the laparoscope.

Indeed, Siddiqui was breaching the standard of care by, in effect, instructing Dr. Mirza to

perform the operation via the laparoscopic means, when medical necessity demanded that the

procedure be converted to the open technique.  The standard of care is that the operation must be

converted to an open procedure as soon as the operating surgeon determines that the operation

cannot be completed by laparoscopic means.  In response, Dr. Mirza explained that because of

the advanced disease, which distorted and obscured the patient's anatomy, the procedure had to

be converted to open, but at no time did Dr. Mirza say out loud in the operating room that it was

difficult, and even if she had stated that the procedure was complex, it is not indicative of her

finding it challenging, but an articulation of a criteria that medically necessitates that the

procedure be converted to the open technique, as Dr. Siddiqui should have known.  As to the

monitor, the issue was that the monitor malfunctioned and went blank; Dr. Mirza needed no

lesson the on use of the monitor.

78.     On May 24, 2018, Dr. Mirza requested and had a meeting with Dr. Oxley to

convey to him the issues Dr. Siddiqui was raising and the unreasonable disparagement she was

receiving from Dr. Siddiqui.  Dr. Oxley manifested obliviousness to all the points Dr. Mirza had

raised, and affirmatively stated that he had no complaints about Dr. Mirza's performance.  On

May 24, 2018, Dr. Oxley directly contradicted Dr. Siddiqui when he complained to Dr. Mirza

that "that they say in the ED that you ask them what scans to get."  While Siddiqui had claimed

on May 16, 2018 that Dr. Mirza was not maintaining a "happy medium" because she was not

abiding by the wishes of the ED physicians who did not want scans to be ordered, here was Dr.

Oxley accusing Dr. Mirza of complete reliance upon the ED staff in having the ED staff

determine what scans were needed.  Here, as in many other instances, ORMC/GHVHS have

27

manifested a pattern of a lack of consistency in their claims, as their staff and administration tend to contradict each other, which only serves to undermine the credibility of ORMC/GHVHS and highlights that whatever allegation they cook up does not hold up.  In response to Oxley's claim that the ED was alleging that Dr. Mirza asked what scans to order.

79.    Since ORMC is a teaching hospital, Dr. Mirza applied her Harvard-utilized teaching methods to residents at ORMC and in doing so quizzed residents on what tests were necessary, and then corrected them.  Thus, in response to Dr. Oxley claiming that the ED staff had informed him that Dr. Mirza asked ED staff which scans needed to be done, Dr. Mirza explained to him that given ORMC was a training program, she was required to ask residents questions and that her asking residents or the PAs what studies or scans ought to be done was part of the teaching and training process, before telling them or correcting them what studies were actually needed.  After Dr. Mirza explained this to Dr. Oxley, he replied "you obviously know what you are doing."  Dr. Oxley agreed that some of the staff had issues with Dr. Mirza because she is the only female trauma surgeon, and Dr. Singh, a male surgeon at ORMC, would not have been questioned as Dr. Mirza was.

80.    The same day on May 24, 2018, Dr. Mirza telephoned Dr. Oxley to ask if ORMC was using bad faith false complaints as a pretext to terminate her employment, and that if ORMC really wanted her to leave, she was willing to resign amicably rather than suffer the harassment of these bad faith complaints and continue to work at an institution which was not operating in the best interests of patients and potentially harming patients.  Oxley then confirmed that "we would hate to lose someone with your quality."

81.    On May 29, 2018, Dr. Siddiqui called Dr. Mirza to a meeting, and promptly told Dr. Mirza that "you are not perceived to be competent in the OR and in the ER, by the

administration" and that the Administration is thinking of letting Dr. Mirza go, and thinking of

what to do.  Dr. Mirza was astonished and replied, "now suddenly after 5 months are over, there

are issues with me, up until now there hasn't been an issue.  The issue with the gall bladder

laparoscopic procedure was a problem with the monitor—nothing else.  So what is really going

on?"

82.     Dr. Siddiqui then instructed Dr. Mirza that when she went to the Operating Room

to do a General Surgery Operation, she should take a colleague with her—meaning Dr. Mirza's

ability to do general surgery independently was prohibited.  In the alternative, Dr. Siddiqui

offered that Dr. Mirza could take all 14 trauma calls and drop off the general surgery schedule

entirely, both alternatives are breaches of Dr. Mirza's contact.  Moreover, if Dr. Mirza were

required to have someone in the operating room to "proctor" her, because of an alleged

competency problem, and the proctoring were to go on for 30 days, it would become a

"reportable event" to the National Practitioner Data Bank ("NPDB") and that report would

become a permanent part of Dr. Mirza record.  In effect, Dr. Mirza's duties and responsibilities

were being restricted and she was being demoted to trauma, because she was given the option to

continue general surgery strictly under the untenable condition of being "proctored," whereby

she would be reported to the NPDB.  This threat of Dr. Mirza being reported to the NPDB was

retaliatory action by ORMC/GHVHS in response to Dr. Mirza's whistleblowing against the

fraudulent billing schemes and violations of the standard of care at ORMC.  In addition,

attempting to impose 14 full trauma calls would have been unsustainable, and thus was a

punishment in retaliation for Dr. Mirza's whistleblowing against both the fraudulent billing and

violations of the standard of care.

83.     Dr. Mirza had already gone through observation and had demonstrated a variety of General Surgery Operations, when she was hired by GHVHS in order to fulfill the requirements of ORMC's Focused Professional Practice Evaluation ("FPPE"), that all new surgeons must pass.  Dr. Siddiqui cleared Dr. Mirza on March 17, 2018, saying "you are all set and do not need other attendings to observe anymore."

84.     The May 29, 2018 meeting was cut short, when Dr. Siddiqui received a call from the operating room that Dr. Fasanya was asking Dr. Siddiqui for assistance during a general surgery operation that Dr. Fasanya was performing.  Dr. Siddiqui hung up the telephone and told Dr. Mirza to go to the operating room to help Dr. Fasanya.  While on her way to the operating room to assist Dr. Fasanya, Dr. Siddiqui ran up behind her and said, "its ok you don't have to go, I'll go down to the operating room."  Obviously, if Dr. Siddiqui truly believed Dr. Mirza was incapable, he would have never asked Dr. Mirza to assist, however, realizing the incongruity of his false accusation of incompetence, with an immediate order to Dr. Mirza to go assist another doctor who was in the middle of a General Surgery Operation, he changed course.

85.     There is also incongruity in asking Dr. Mirza to take 14 trauma surgery calls. Trauma operations are very often more complex than general surgery operations.  So, if Dr. Mirza was competent to take on trauma surgery independently, she was obviously more than competent to do general surgery.  All of these incongruities add up to bad faith false and pretextual moves to push Dr. Mirza out of GHVHS.

86.     Also on May 29, 2018, after Dr. Mirza's meeting with Dr. Siddiqui, she requested and had a meeting with Dr. Oxley and told Dr. Oxley what Dr. Siddiqui had just told her, including the fact that Dr. Siddiqui had showed Dr. Mirza an e-mail, he said was from Dr. Oxley in which he questioned Dr. Mirza's competence.  Dr. Mirza also told Oxley that Dr. Siddiqui had

communicated to her that all these issues were coming from administration, and it was

"Administration" that had a problem with Dr. Mirza.  Dr. Oxley denied that any issue about

competence was coming from "Administration," and instead told Dr. Mirza that the issues were

being raised by Dr. Siddiqui himself—not the "Administration."  Dr. Oxley then said he would

speak to Dr. Siddiqui, and tell him to stop the accusations.  This is yet another incident of

ORMC/GHVHS staff and administration contradicting each other, thus undermining their own

credibility.

87.     Compounding further the pattern of ORMC/GHVHS staff and administration

contradicting each other, Dr. Galarneau directly contradicted Dr. Oxley's claims that issues were

being raised by Dr. Siddiqui himself and not the administration, when Dr. Galarneau informed

Dr. Mirza on June 2, 2018, with regard to a purported investigation of her, that had concluded

with restricting her from both trauma and general surgery.  Dr. Galarneau claimed that Dr. Oxley

"wanted to restrict your laparoscopic privileges, which is a reportable event."  Dr. Galarneau

then claimed that he had prevented that.  Similarly, Dr. Siddiqui informed Dr. Mirza on June 2,

2018 that "they were going to report you to the National Practitioner Data Bank on Friday [June

1]..."  Both Dr. Siddiqui and Dr. Galarneau were knowingly making false statements when they

informed Dr. Mirza that the administration had wanted to report her to the national practitioner

data bank, because a criterium for reporting to the data bank is that the restriction must be for

more than 30 days.  Given that Dr. Siddiqui and Dr. Galarneau were threatening and attempting

to intimidate Dr. Mirza with a report they knew very well they could not make, is indicative of

bad faith and malice and was done in retaliation against Dr. Mirza for her whistleblowing against

ORMC/GHVHS for their billing fraud and violations of patient care.

88.     Dr. Siddiqui's May 13, and May 16, 2018, tirades against Dr. Mirza, as well as other instances of accusations, restrictions, demotions, and criticisms of Dr. Mirza which were unsupported and unwarranted, also constitute part of this pattern and scheme of harassment against Dr. Mirza in retaliation for her whistleblowing.

89.     ORMC/GHVHS's allegations regarding the laparoscopic procedure of May 22, 2018, were fabricated.  In fact, the falsity and bad faith of ORMC/GHVHS's allegations are revealed by the pattern of immediately coming up with new serial false allegations regarding that procedure every time Dr. Mirza knocked down their prior allegations.  On May 23, 2018, Dr. Siddiqui made two false accusations against Dr. Mirza pertaining to that operation.  Dr. Mirza immediately debunked the false allegations:  First by clarifying to Dr. Siddiqui that the conversion of the operation from laparoscopic to open was done due to medical protocol rather than her personally finding the operation "difficult."  Second, Dr. Mirza informed Dr. Siddiqui that the monitor had malfunctioned—she knew perfectly well how to read the monitor. Moreover, on May 24, 2019, Dr. Oxley acknowledged that fault did not lie with Dr. Mirza, but admitted that this was an issue of the complaining nurse having sexist issues with a female doctor.  However, once Dr. Mirza had discussed this matter with both Dr. Siddiqui and Dr. Oxley, and they accepted her clarification.

90.     That night, however, on May 24, 2018, Dr. Mirza received a new query from the Quality Department, asking why the laparoscopic operation had been prolonged and why it had been converted to open.  Dr. Mirza answered the query and explained why medically it was necessary, thus putting to rest any questions.  On May 29, 2018, Dr. Oxley again raised the query from Quality, and added a yet another new issue, claiming that the nurse after her series of piecemeal allegations regarding this single case had already been debunked by Dr. Mirza, had

now magically remembered and alleged that Dr. Mirza did not know where to put the ports during that laparoscopic operation.

91.    If this new issue were a legitimate complaint, it should have been raised immediately—not seven days after the procedure and after Dr. Mirza debunked the prior false allegations.  ORMC/GHVHS played out this entire production over the laparoscopic operation as a game of whack-a-mole, desperately coming up with new false accusations, once Dr. Mirza had knocked down their prior accusations.

92.    Furthermore, on January 27, 2018, and on March 3, 2018, Dr. Mirza had already successfully demonstrated her capability to do laparoscopic cholecystectomy that had been part of her FPPE requirements, using the same equipment, monitor, and ports, where she had been observed and cleared by other surgeons without any issues with the operation or her ability to use the equipment, monitor or ports. Subsequently, Dr. Siddiqui had already cleared Dr. Mirza from further observations and informed her on 03/17/2018 via email that "you are all set and do not need other attending to observe anymore." As such, it is not within the realm of possibility that she had forgotten how to do the same operation in May, 2018, given that all the issues that the ORMC/GHVHS were raising with her May 22, 2018 laparoscopic operation were pertaining to specific factors which the January 27 and March 3, 2018 operations were inclusive of, and for which she had already been observed and cleared without any issues.

93.    Furthermore, the fact and timing that ORMC had started the process of credentialing replacement surgeons before any of the pretextual accusations arose, also implies that all these allegations and criticisms of Dr. Mirza were in bad faith and done as part of a pattern and scheme of harassment against Dr. Mirza in retaliation for her whistleblowing.

### E.     Fraudulent Inducement.

94.     ORMC was in the process of obtaining American College of Surgeons ("ACS")

Trauma Verification (Certification) for a Level 2 Trauma Center Designation.  Indeed, prior to

Dr. Mirza's start date in January 2018, the American College of Surgeons made a "Consultative

Visit" of ORMC.  From the American College of Surgeons:

 "The American College of Surgeons Committee on Trauma (ACS COT) will provide a hospital
consultation visit—at the request of a hospital. A consultation visit follows the same format as a
verification review.  It provides recommendations and aids the facility in attaining verification."

Verification:

"Trauma center verification is the process by which the ACS confirms that the hospital is
performing as a trauma center and meets the criteria contained in *Resources for Optimal Care of
the Injured Patient*.  A verification review process results in a report outlining the findings and, if
successful, a certificate of verification is issued.  If, during a verification review, a hospital is
found to have criterion deficiencies, it must demonstrate that they have been corrected before a
certificate is issued."

95.     Before Dr. Mirza was hired, ORMC's trauma program was operated by only one

full-time surgeon—the trauma medical director Dr. Siddiqui, with a few part-time surgeons.

Having full-time surgeons is a critical and integral to a trauma program, and ORMC recruited

Dr. Mirza—at a high salary, to join ORMC for the ACS verification and certification process,

because the ACS would have directed ORMC to get full-time trauma surgeons on staff at the

hospital, as the lack of Full time Trauma surgeons was a "Criterion Deficiency."

96.     Among other things the ACS reviews patients' charts to verify the standard of

care is being provided, reviews call schedules to see if full-time surgeons are on schedule, and

reviews complications and mortality rates of patients.

97.     First, Dr. Mirza was fraudulently induced to accept what was presented as a two-

year term contract, when in fact, ORMC intended to terminate Dr. Mirza in six months under the

terms that made the contract "at will" employment.  Terminating the contract before the 6-month

milestone relieved ORMC from paying the monetary benefits at the 6-month mark—benefits, such as a sign on bonus are in practice paid up front—not in installments.  The $10,000 signing bonus was payable in two $5,000 installments, one payment at the completion of six months and the second at the completion of one year.  In fact, Dr. Mirza did not take other job opportunities, which Dr. Mirza disclosed to Mr. Dunlavey and GHVHS Recruiter Michael Gailie, in reliance on the false presentation that her contract with ORMC had a 2-year term.

98.     Given that Dr. Mirza was foregoing other job opportunities as well as making a cross country move to the east coast in accepting the job offer at GHVHS/ORMC, she wanted to be certain that this was not a job of short-term duration.  In response to Dr. Mirza's queries in this regard, as to whether this was indeed a two-year contract and not intended to be for a lesser duration, ORMC assured Dr. Mirza that her employment was indeed intended to be for at least 2 years.

99.     In addition, Dunlavey misrepresented the actual workload to be less than what it actually was to induce Dr. Mirza to accept the contract, and a letter of intent that was signed at the outset also misrepresented the work to be less than it actually was, as part of fraudulent inducement.

100.     Mr. Gailie then assured Dr. Mirza that the contract was for two years—not a short term, and that the position would not end if the ACS certified the hospital prior to the 2-year term of the contract.

101.     ORMC's intent on terminating Dr. Mirza prior to her 6-month milestone is shown by the fact that ORMC had in the process the credentialing of replacement surgeons before any of the pretextual accusations arose.  On June 10, 2018 locum's trauma surgeon Dr. Jonathon

Rubin was credentialed to start; his credentialing decision had to have been taken prior to May 16, 2018—days before false pretextual accusations were leveled against Dr. Mirza.

F.      **Defamation and Tortious Interference with Prospective Business/Employment Relations.**

102.     By virtue of rejecting her resignation and converting it to a termination, and then issuing the false and malicious statement that she was recommended "with some reservation," Defendants have per se defamed her and caused her demonstrable and special damages harming her career, reputation, professional standing, and livelihood, as well as directly interfering with future employment. This defamation has also prevented Dr. Mirza from obtaining employment and mitigating her loss of salary, and to date after leaving ORMC/GHVHS Dr. Mirza remains unemployed due to the malicious defamatory actions of ORMC/GHVHS. Dr. Mirza's ability to mitigate her damages was furthermore undermined by the restrictive covenant in her contract.

G.      **Breaches of Contract.**

1.      **GHVHS Breached Its Policies and Practices in Its Handbooks.**

103.    The GHVHS Code of Conduct Corporate Compliance states:

104.     "All individuals have an obligation to and are required to report violations of the Code of Conduct & Compliance Plan. The GHVHS has established procedures that allow individuals to safely and anonymously report unethical and illegal actions, without fear of reprisal. The GHVHS has a non-retaliation policy for personnel who raise compliance concerns or who report known or suspected violations of the Corporate Compliance Program or of federal or state laws. Personnel are also afforded protection by law for reporting known or suspected violations of federal and New York State False Claims laws and regulations. You are required to report any activity reasonably believed to be in violation of law, regulation, or policy to anyone in Management, the Compliance Office. . . ."

https://www.ormc.org/wp-content/uploads/2018/05/Code-of-Conduct-Corporate-Compliance-Plan.pdf_at 4 (a).

105.    "This policy also outlines the GHVHS pledge of non-retaliation for those who report misconduct in good faith.  It is our policy to take all necessary steps to refrain from intimidating, threatening, coercing, discriminating against, or taking any other retaliatory action against any staff member or individual for reporting misconduct."  An "open-door policy" shall be maintained at all levels of management for employees to report problems and concerns and shall be acted upon in an appropriate manner.  *Id.* at 6.  Pages 10 and 11 elaborate on reporting non-compliance, non-intimidation, and non-retaliation.

106.    Defendants breached the terms and provisions of the GHVHS Medical Group P.C. Employee Handbook, which states:  "REFERENCES  In the event you leave the employ of the Medical Group, we will be able to provide references to potential employers with such references consisting only of confirmation of the dates that you worked at GHVHS Medical Group, PC, the position(s) you held and the pay rate upon cessation of employment."  GHVHS Medical Group P. C. Employee Handbook at page 32 Section VIII, If You Leave Us.

107.    In addition, the Employee Handbook further provides that the terms of the nonretaliatory policy.  *Id.* at 3.  By repeatedly engaging in retaliation against Dr. Mirza, GHVHS/ORMC violated all of its codes of conduct.

## 2.    Failure to Pay Moving Expenses.

108.    As set out in Section 6.8 of Dr. Mirza's contract, she was entitled to moving expenses, the receipts for which have been submitted but not paid.  This failure is also a retaliatory measure taken against Dr. Mirza for her whistleblowing actions.

## 3.   Restriction of Duties and Responsibilities and Demotion.

109.     The restriction of duties and responsibilities and demotion constitutes at least

three disparate causes of action: a breach of contract claim, a retaliation claim under the

whistleblowing cause of action, and furthermore claims under state laws.

110.     From the outset and in numerous repeated instances, Dr. Siddiqui forbade Dr.

Mirza from performing her job according to the standard of care either via instructions that

surgeons follow particular general practices of ORMC/GHVHS that were in violation of the

standard of care, or by trying to restrict and criticize her orders for medically necessary

diagnostic tests, or otherwise by engaging in retaliatory actions via criticizing Dr. Mirza's

following necessary medical protocol, all of which constitute breaches of contract because by

instructing Dr. Mirza to either limit her role or not follow the proper standard of care,

ORMC/GHVHS were in effect attempting to obstruct Dr. Mirza from performing her duties that

she was contracted to perform.

111.     The specific instances of breach of contract by ORMC/GHVHS by their

restricting, discouraging, or criticizing Dr. Mirza from following the standard of care include, but

are not limited to, the instances discussed in this section and section D above.

112.     ORMC/GHVHS also retaliated against Dr. Mirza for her whistleblowing actions

by its concerted campaign of harassment that comprised of restricting her duties and

responsibilities and demotion which also include but are not limited to the instances discussed in

this section in section D above, and which forced Dr. Mirza to tender her resignation in what was

in effect a constructive dismissal.

113.     On June 1, 2018 Dr. Siddiqui, without any basis, stripped Dr. Mirza of her duties

and responsibilities in performing general surgery operations and trauma surgery operations for

June 2 and 3, 2018,—the very job duties for which she had been hired.  Dr. Siddiqui gave no

reason for this when Dr. Mirza inquired what the problem was with her cases that had led to this. Further, Dr. Siddiqui attempted to unilaterally modify the contract under duress by trying to force Dr. Mirza to eliminate general surgery duties and double her trauma surgery assignments.

114.    The restrictions placed upon Dr. Mirza for June 2 and 3, 2018 constitute at least two disparate causes of action: a breach of contract; and also retaliation for Dr. Mirza's whistleblowing.

115.    These restrictions and demotion of Dr. Mirza for June 2 and 3, 2018 were in bad faith and thus retaliatory, because of the three cases that these were premised on, one of the cases was the laparoscopic cholecystectomy case over which ORMC/GHVHS had exhibited a clumsy and desperate game of whack-a-mole in raising its accusations and having them knocked down. Furthermore, on January 27, 2018, and on March 3, 2018, Dr. Mirza had already successfully demonstrated her capability to do the same laparoscopic cholecystectomy as part of her FPPE requirements, using the same equipment, monitor, and ports, where she had been observed and cleared by other surgeons without any issues with the operation or with any of the specific factors which were later raised as issues in her May 22, 2018 laparoscopic operation, including her ability to use the monitor or port *etc.*, so ORMC/GHVHS alleging that she did not know how to do this operation or had issues with things that she had already demonstrated capably without issues were not credible.  The other two cases/operations had never been raised before as issues even though they had occurred **prior** to this laparoscopic cholecystectomy case, and were only now being raised as issues, for the first time.  Why were these two other cases also not raised by Dr. Oxley during his discussions/meetings with Dr. Mirza on May 24 and May 29, 2018, given that Dr. Oxley should have known about these other two cases and should have communicated any issues with them to Dr. Mirza when he was raising the issue of the laparoscopic

cholecystectomy operation during his discussions with Dr. Mirza, given that these other two cases had occurred before the laparoscopic cholecystectomy case.

116.    The restriction of Dr. Mirza from performing any kind of operation for 06/02/2018 and 06/03/2018 was in bad faith and in retaliation of her whistleblowing, because this restriction was overly broad and not commensurate with the purported investigation of the procedures. The restriction had been premised on three particular cases; laparoscopic appendectomy, laparoscopic cholecystectomy, and hernia. If indeed, issues with these 3 particular cases had been raised in good faith then it still does not warrant the excessive restriction over all general and trauma surgery cases, thus signifying such restriction as unjustified.

117.    On June 2, 2018, Dr. Galarneau informed Dr. Mirza that the decision to impose a restriction was made in by a committee with the agreement of Dr. Oxley.  The restrictions are shown to be in bad faith, because only a few days prior, on May 24, 2018, Dr. Oxley had affirmatively stated to Dr. Mirza that he had no complaints about her performance, and stating that "we would hate to lose someone with your quality."  Dr. Oxley also stated, "you obviously know what you are doing," and on May 29, 2018, assured Dr. Mirza that she was at ORMC for the "long haul."

118.    Furthermore, if the accusations were considered credible by ORMC/GHVHS, and not in bad faith, they would have terminated Dr. Mirza "with cause" instead of "without cause," but Dr. Mirza exposed the falsity of the accusations, so they could not terminate her "with cause."

### 4.    Violation of Bylaws

119.    The violation of the bylaws constitutes at least two disparate causes of action: a breach of contract claim and also a retaliation claim under the whistleblowing cause of action.

120.    The defendants did not follow their policies and bylaws by failing to undertake a good faith investigation and also failing to put Dr. Mirza on notice regarding the purported investigation, rather Dr. Mirza's was punished by false allegations for which she did not have an opportunity to formally give her account as she was only informed about the investigation after it had concluded, she did not have her account submitted, rather, her duties were summarily restricted. Furthermore, after the purported issue regarding the ports in the laparoscopic operation had been raised, Dr. Oxley informed Dr. Mirza that if the committee were to review this cause then they would call Dr. Mirza to give her account, which was never done, in violation of both Dr. Oxley's assurances and the bylaws.

121.    Failure to follow their own bylaws constitutes a breach of contract by ORMC/GHVHS. The employment contract expressly states that Dr. Mirza is to abide by the bylaws of the hospital.  ORMC/GHVHS made Dr. Mirza's compliance with the bylaws contractual; the bylaws are specifically adopted in the contract and must also mutually apply to ORMC/GHVHS.  By not following its own Bylaws when restricting Dr. Mirza, ORMC/GHVHS breached the contract.

122.    The fact that the defendants did not follow their own bylaws in restricting Dr. Mirza for June 2 and 3, 2018 implies that their actions were done arbitrarily, in bad faith, and with malice, thus showing the retaliatory nature of the actions against Dr. Mirza as a consequence of her whistleblowing against both ORMC/GHVHS's fraudulent schemes and violations of the standard of care.

123.    In his June 2, 2018 email, Dr. Siddiqui implied to Dr. Mirza that the investigation was still ongoing.  Dr. Siddiqui was then contradicted by Dr. Galarneau on the same day when Dr. Galarneau informed Dr. Mirza that the investigation had already concluded on June 1, 2018.

41

Given that both these men would have been present at the investigation meetings, it defies belief that they were not on the same page whether the investigation had concluded or not.  These contradictory statements regarding the status of the alleged investigation implies that the investigation was a sham.  Even if the investigation was carried out, given that Dr. Mirza was not informed of it until after its completion, in violation of the bylaws, reveals that it was a secret investigation/meeting to deprive Dr. Mirza the ability to present her side of the story.  ORMC Bylaws violations of Part II, 2.2, 3.2.1, and 3.2.2 (requiring a meeting and investigation within 10 days) are present.

### 5.   Rejecting Dr. Mirza's Resignation, Terminating Her, and Defaming Her.

124.    Rejecting Dr. Mirza's resignation constitutes at least two disparate causes of action: a breach of contract, and also retaliation underlying Dr. Mirza's whistleblower cause of action. Termination, similarly, constitutes at least two disparate causes of action:  a breach of contract and also retaliation.  Dr. Oxley's statement "with reservation" that was made to a credentialing company gives rise to three different causes of action: defamation, breach of contract, and retaliation.

125.    On June 2, 2018, Dr. Galarneau told Dr. Mirza that her resignation was an option—after trying to terminate her for cause on unsupported accusations.  On Saturday June 2, 2018, on a telephone call with Dr. Galarneau, he again affirmed that Dr. Mirza was expected to resign.  After submitting her resignation on June 4, 2018, GHVHS rejected her resignation without any legal basis and issued a termination without cause.

126.    ORMC/GHVHS engaged in retaliation against Dr. Mirza by rejecting Dr. Mirza's resignation in violation of the contract.  Defendants rejected the resignation under the ridiculous contention that her resignation named her employer as ORMC rather than GHVHS.  Furthermore, the rejection of Dr. Mirza's resignation was done in bad faith, as only a few days

prior, on May 24, 2018, Dr. Oxley had indicated to Dr. Mirza that the administration had no

plans to terminate her employment and even persuaded Dr. Mirza not to resign when she had

offered to amicably resign if ORMC was seeking the termination of her employment, by telling

her that "we would hate to lose someone with your quality."

127.    On May 29, 2018 Dr. Oxley again indicated to her that administration had no

plans to terminate her employment and discouraged Dr. Mirza from resigning by telling her that

she was at ORMC for the "long haul."

128.    The fact that Dr. Mirza was discouraged from resigning by both Dr. Oxley on

May 24, 2018 and May 29, 2018, and Dr. Galarneau on June 2, 2018 shows that the rejection of

Dr. Mirza's resignation and termination of her employment was done in bad faith in retaliation,

so that the derogatory "termination" could be added to her records instead of a "resignation." The

rejection of Dr. Mirza's resignation was a violation of the contract because Dr. Mirza's contract

permitted her to resign.  By refusing to accept her resignation and by indicating that she was not

free to resign but could only be fired, ORMC/GHVHS was in effect treating Dr. Mirza's

employment as involuntary servitude of a professional in gross violation of human rights laws.

129.    After the termination, GHVHS, in conformity with its policies and practices, as

for instance, delineated in it handbooks, informed Dr. Mirza that prospective employers would

only be told the dates of employment, and breaching these contractual obligations Dr. Oxley

unsolicited by a credentialing company gratuitously prepared and issued, and without any input

from Dr. Mirza, a recommendation "with some reservation," thus defaming her maliciously and

falsely and causing her to lose future employment.

130.    Furthermore, Dr. Oxley's statement "with some reservation" lacks credibility as

on May 24, and 29, 2018, when Dr. Mirza had asked Dr. Oxley to let her know if there were any

issues with her performance and that she was willing to amend any issues, Dr. Oxley had negated the existence of any issues and affirmatively stated that he had no complaints about Dr. Mirza's performance, and told her that "we would hate to lose someone with your quality."

131.    On May 24, 2018, Dr. Oxley had also assured Dr. Mirza, stating that "you obviously know what you are doing." Similarly, on May 29, 2018, Dr. Oxley had exhibited oblivion regarding any issues with Dr. Mirza and had indicated that any issues were being raised by Dr. Siddiqui himself and not the "Administration" and informed Dr. Mirza that she was at ORMC for the "long haul."

132.    ORMC/GHVHS first attempted to terminate Dr. Mirza's employment "with cause" in order to discredit her claims if she brought her knowledge of false claims to the government, and this was being done in retaliation to Dr. Mirza's whistleblowing.

133.    ORMC/GHVHS did not have any grounds to terminate Dr. Mirza's employment "with cause," because Dr. Mirza had exposed their accusations as meritless.  ORMC/GHVHS then attempted to discredit her after the fact with its retaliatory defamatory statement "with some reservation."

134.    Moreover, shamelessly and cowardly, Dr. Oxley and Mr. Dunlavey have refused to date to even provide a reason for the statement "with some reservation"—because there is no reason for that statement other than to retaliate against Dr. Mirza for calling out ORMC's billing fraud, patient harm and abuse.  *See* Exhibits C and D hereto (In Dr. Mirza's request for an explanation for the comment "with some reservation, ORMC arrogantly replied that it owed Dr. Mirza no explanation for the comment "with some reservation" and in effect were entitled to defame her because of a purported waiver she had signed, which is wrong.).  The retaliation is not only an attempt to discredit Dr. Mirza's whistleblowing, it sends a signal to the staff of

44

ORMC that blowing the whistle on fraud and low-quality patient treatment will be met with the gross damage to one's career.

## FIRST CLAIM
### Violations of the Federal False Claims Act
### (31 U.S.C. § 3730(h))
### Retaliation as Against ORMC and GHVHS

135.   Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

136.   Defendants violated Section § 3730(h) of the False Claims Act, 31 U.S.C. § 3730(h).

137.   Defendants have intentionally retaliated against Plaintiff by marginalizing her and terminating her without valid reason, by defaming her, by harming her professional and career advancement and potential employment opportunities for which she is well qualified.

138.   Such conduct by Defendants was due to actions Plaintiff has taken in furtherance of her efforts to stop fraud and abuse, or filing a False Claims Act action, or notifying the government, and Defendants had actual and constructive knowledge of such actions.

139.   Such conduct by Defendants has damaged Plaintiff in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

## SECOND CLAIM
### Violations of the State False Claims Act
### (N.Y. Fin. Law § 191)
### Retaliation as Against ORMC and GHVHS

140.   Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

141.   Defendants violated Section 191 of the New York False Claims Act § 191.

142.    Defendants have intentionally retaliated against Plaintiff by marginalizing her and terminating her without a valid reason, by defaming her, by harming her past, present, and future business and professional and career development.

143.    Such conduct by Defendants was due to Plaintiff's actions taken in furtherance of her efforts to stop fraud and abuse, or filing a False Claims Act action, or notifying the government, and Defendants had actual and constructive knowledge of such actions.

144.    Such conduct by Defendants has damaged Plaintiff in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

**THIRD CLAIM**
**New York Labor Law § 741**
**Retaliation As Against ORMC and GHVHS**

145.    Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

146.    Defendants violated New York Labor Law § 741.

147.    Defendants have intentionally retaliated against Plaintiff by marginalizing her and terminating her without valid reason, by defaming her, by harming her past, present, and future business and professional career development.

148.    Such conduct by Defendants was due to Plaintiff's actions as a health care worker in a health care facility taken in furtherance of her efforts to stop patient harm, and abuse, or notifying the government, and Defendants had actual and constructive knowledge of such actions.

149.     Such conduct by Defendants has damaged Plaintiff in a substantial amount, including but not limited to personal hardship and economic loss, in an amount to be determined at trial.

**FOURTH CLAIM**
**Injunctive Relief**
**As Against All Defendants**

150.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

151.     Defendants intended and did inflict harm to Plaintiff, which resulted in special damages, including but not limited to the loss of employment, business contracts and business opportunities and by wrongfully terminating her and stating to potential employers that she is recommended "with some reservation."

152.     Such conduct by Defendants has damaged Plaintiff and continues to damage Plaintiff.  Accordingly, Plaintiff seeks injunctive relief of abiding by their agreement not to disparage her and to convert her termination to a resignation, as she intended.  In addition, Plaintiff seeks to void the noncompete agreement he signed before commencing work at ORMC, which unrealistically restricted Plaintiff employment opportunities in the geographic area that she moved to accept the ORMC position.

**FIFTH CLAIM**
**Defamation**
**As Against All Defendants**

153.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

154.     Defendants defamed Plaintiff both by slander and libel.  *See* Exhibit E hereto, which is incorporated by reference.

155.    A person is liable for defamation when: (a) the defendant makes a false statement that identifies the plaintiff; (b) the statement is publicized; and (c) damages exist. A defamatory statement exists when it is one that would adversely affect the reputation of a person.  That statement is considered publicized so long as the defendant tells the statement to one other person, either negligently or deliberately.

156.    When the defamatory statement is verbal, damages are presumed when the statement deals with business or profession.  When the defamatory statement is written and relates to a business or profession, damages are presumed.

157.    If the statement is regarding a private figure but that of a public concern, the plaintiff must prove that the statement was made "in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."

158.    Plaintiff's ability to mitigate her losses by seeking employment was undermined by false and malicious comment in her recommendation that it was made "with some reservation."

### SIXTH CLAIM
### Interference with Business Relationships
### As Against All Defendants

159.    Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

160.    Defendant's intentionally interfered with Plaintiff's business relationships thus causing third parties to cease relations with Plaintiff.  Plaintiff has attempted to obtain at a major hospital facility, but Defendants sabotaged that business relationship by defaming Plaintiff.

**SEVENTH CLAIM**
**Breach of Contract**
**As Against ORMC and GH**

161.    Plaintiff incorporates by reference the paragraphs above as if fully set forth

herein.

162.    Defendants violated two contracts with Plaintiff.

163.    At all times Dr. Mirza fulfilled all terms of her employment contract with ORMC

and GH, as well as the agreement entered into at her departure.

164.    Defendants breached Dr. Mirza's employment contract by making her work the

job far in excess of that described in the letter of intent and contract of employment.

165.    Defendants breached Dr. Mirza's contract by demoting her to by a stand-by

status, to have her general surgery proctored, and demoting her to 14 trauma shifts, thus

changing the terms of her contract unilaterally and preventing her from practicing medicine as

she had agreed in her contract to do.

166.    Defendants breached Dr. Mirza's contract by directing her to practice medicine

below the standard of care, thus subjecting her patients to risk of harm and subjecting her to

potential malpractice claims.

167.    Defendants breached the contract by failing to accept her resignation and instead

terminating her contract.

168.    Defendants further failed to abide by the contract, Handbook, Compliance Code

and Bylaws by failing to give her notice and opportunity to respond to a "purported

investigation" and also failed to abide by the contract, Handbook, Compliance Code, and Bylaws

by retaliating against her when she was contractually obligated to raise issues of patient neglect,

49

harm and abuse, and to alert Defendants to violations of the federal and New York State False

Claims Acts.

169.    Defendants breached their agreement made through Dunlavey that the Defendants

would not harm her future employment prospects.

170.    Defendants breached their agreement with Dr. Mirza not to harm her future

employment prospects by reporting that she was recommended "with some reservation," and

further failed to correct that publication, when presented with the opportunity.

171.    Defendants further breached the agreement by placing unreasonable restrictions in

a covenant not to compete that further undermined her ability to mitigate her damages.

### EIGHTH CLAIM
### Fraudulent Inducement to Contract
### As Against GHVHS and Dunlavey

172.    Plaintiff incorporates by reference the paragraphs above as if fully set forth

herein.

173.    Defendants' fraudulently induced Plaintiff into her employment contract by

assuring her it was for a two-year term, when actuality, Defendants intended to terminate

Plaintiff before the payment of her sign on bonus, and to treat her contact as employment at will.

174.    Plaintiff informed Defendants of other job opportunities and the requirement of a

two-year contract to move from the Midwest to assume this position.  Defendants assured

Plaintiff that the contract term was in fact two years, upon which assurance Plaintiff relied to her

detriment.

175.    Defendants fraudulently induced Plaintiff to accept the position at a high salary,

to use her credentials to help ORMC acquire Trauma Level 2 certification from the ACS, with

the intent to terminate her and higher a lesser qualified trauma surgeon.

176.    Plaintiff has been damaged by the fraudulent inducement in an amount to be determined at trial.

WHEREFORE, Plaintiff requests that judgment be entered in her favor and against Defendants as follows:

(a)    On the First, Second and Third Claims for Relief (violations of the False Claims Act, 31 U.S.C. § 3730 (h), N.Y. Fin. L. § 191, and N.Y. Labor § 741), for double her back salary in an amount to be determined at trial, and restitution and payment of all benefits with interest.

(b)    On the First, Second and Third Claims for Relief (violations of the False Claims Act, 31 U.S.C. § 3730 (h), N.Y. Fin. L. § 191, and N.Y. Labor Law § 741, an award of costs and attorney's fees; and

(c)    On Fourth Claim awarding the Plaintiff injunctive relief, including accepting her resignation and giving her recommendations with conditions and ceasing all disparagement of her including litigation costs, and reasonable attorney's fees;

(d)    On all other claims an amount to be determined at trial, including litigation costs and reasonable attorney's fees; and

(e)    Awarding such further relief as is proper.

**JURY TRIAL IS DEMANDED**

Dated: New York, New York,
      January 21, 2020

| | | |
|---|---|---|
| | | **ROBERT W. SADOWSKI, PLLC** |
| | | |
| | By: | s/ Robert W. Sadowski |
| | | Robert W. Sadowski<br>800 Third Avenue, 28th Floor<br>New York, New York 10022<br>Telephone: (646) 503-5341<br>rsadowski@robertwsadowski.com |