UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TAHIRA MIRZA, M.D.,

                    Plaintiff,

         -against-

GARNET HEALTH (f/k/a GREATER
HUDSON VALLEY HEALTH SYSTEM,
INC.), et al.,

                    Defendants.

**MEMORANDUM OPINION
AND ORDER**

20-CV-00556 (PMH)

PHILIP M. HALPERN, United States District Judge:

Tahira Mirza, M.D. ("Plaintiff"), a trauma surgeon presently proceeding *pro se*,[1] brings

this action against: (1) Garnet Health (f/k/a Greater Hudson Valley Health System, Inc.) ("Garnet

Health"); (2) Garnet Health Doctors, P.C. (f/k/a GHVHS Medical Group, P.C.) ("Garnet

Doctors"); (3) Garnet Health Medical Center (f/k/a Orange Regional Medical Center) ("Garnet

Medical Center," and these three collectively, "Corporate Defendants"); and (4) James Oxley,

D.O. ("Oxley," and together with the Corporate Defendants, "Defendants").[2] (*See* Doc. 31,

"FAC"). The First Amended Complaint—the operative pleading, stretching 87 pages and more

than 450 paragraphs—presses seven claims for relief against one or more Defendants: (1)

retaliation under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*.; (2) retaliation under the

New York False Claims Act ("NYFCA"), N.Y. Fin. Law § 187, *et seq*.; (3) retaliation under New

York Labor Law § 741; (4) breach of contract; (5) promissory estoppel; (6) defamation/libel *per*

---

[1] Plaintiff, although initially represented by counsel, has been proceeding *pro se* in this matter since October 2, 2020. (Doc. 60).

[2] It is important to note at the outset of this opinion that the Corporate Defendants—Garnet Health, Garnet Doctors, and Garnet Medical Center—were, at the time of the events alleged, known by different names. (*See generally* FAC). In an effort to avoid confusion, the Court has substituted the present identity for each Corporate Defendant where appropriate.

se; and (7) tortious interference with prospective business relationships. (*Id*. ¶¶ 368-467). Defendants, in their Answer to the FAC, press twenty-five affirmative defenses. (Doc. 41).

The Court held a telephonic pre-motion conference on June 8, 2021 to address Defendants' contemplated motion for summary judgment and set a briefing schedule. (June 8, 2021 Min. Entry). Defendants filed their motion papers on July 19, 2021 (Doc. 93; Doc. 94, "Def. Br."; Doc. 95; Doc. 96, "Saccomano Aff."; Doc. 97), Plaintiff filed her opposition papers on August 20, 2021 (Doc. 98, "56.1 CntrStmt."; Doc. 99, "Mirza Decl."; Doc. 100, "Opp. Br."), and the motion was briefed fully with the filing of Defendants' reply memorandum of law in further support of their motion on September 2, 2021 (Doc. 104).

After Plaintiff filed her opposition papers—but before Defendants filed their reply brief— Plaintiff filed: (1) a letter requesting that the Court deny Defendants' motion as untimely under the Revised Civil Case Discovery Plan and Scheduling Order issued by Judge Castel on June 19, 2020, or, in the alternative, grant her leave to file her own pre-motion conference letter (Doc. 101; *see also* Doc. 46);[3] and (2) a letter requesting leave to re-file her opposition papers, claiming that she had filed the "incorrect" papers on August 20, 2021 (Doc. 102). The Court denied the first request but granted Plaintiff leave to "re-file her memorandum of law in opposition to Defendants' motion for summary judgment . . . ." (Doc. 103; Doc. 105). Thereafter, on September 7, 2021, Plaintiff filed: (1) a second memorandum of law in opposition to the pending motion (Doc. 106); (2) a new declaration in support of her opposition, expanding the footprint of that document from 19 Exhibits and 231 total pages to 45 Exhibits (plus cross-cites to other filings) and 257 total pages (Doc. 107); (3) a second copy of her 56.1 Counterstatement of Material Facts (Doc. 108); and (4)

---

[3] This matter was initiated on January 21, 2020 and proceeded before Judge Castel until it was reassigned to this Court on September 21, 2020. (*See* Sept. 21, 2020 Entry).

a new document—totaling 77 pages and 251 paragraphs—entitled, "Plaintiff's 56.1 Statement of Undisputed Additional Facts" (Doc. 109). All four documents were dated September 7, 2021.

Days later, on September 10, 2021, Defendants filed a letter requesting that Plaintiff's September 7, 2021 filings be stricken because they went beyond what the Court authorized. (Doc. 110).[4] Plaintiff opposed the request and, on September 14, 2021, the Court granted Defendants' motion. (Doc. 111; Doc. 112; Doc. 113). The Court held that:

> [u]pon review, it seems that Plaintiff's request to "refile" only her memorandum of law in opposition to Defendants' moving brief was, at best, disingenuous. Accordingly, the papers Plaintiff filed on August 20, 2021, in accordance with the Court's briefing schedule, are the documents that the Court will consider on the pending motion for summary judgment.

(Doc. 113 at 3 (internal citation omitted)).

Approximately two weeks after that Order, on October 1, 2021—after the parties filed nine more letters (*see* Doc. 114; Doc. 115; Doc. 116; Doc. 117; Doc. 118; Doc. 120; Doc. 121; Doc. 122; Doc. 123)—the Court issued an Order that concluded as follows:

> In light of the foregoing, Plaintiff's motions for reconsideration (Doc. 114, Doc. 115, and Doc. 116) and her unauthorized sur-reply characterized as a motion to strike parts of Defendants' summary judgment filings (Doc. 117) are DENIED. Defendants' motion to have Plaintiff disclose whether she is receiving assistance from counsel and, if so, directing counsel to comply with this Court's Individual Practices (Doc. 122) is GRANTED.
>
> The remaining letter motions filed by Plaintiff on September 24, 2021 and September 30, 2021 (Doc. 120, Doc. 121, and Doc. 123) were, in fact, responses in further support of existing letter motions and should not have been filed as new letter motions.

---

[4] That letter provided a comparison between Plaintiff's initial brief and the revised version. (Doc. 110-1).

(Doc. 124 at 8).[5]

For the reasons set forth below, Defendants' motion is GRANTED.

## BACKGROUND

The Court draws the undisputed material facts from the pleadings, Plaintiff's Counterstatement to Defendants' 56.1 Statement (i.e., that 56.1 Statement including both Defendants' proposed facts with Plaintiff's responses thereto), the Affirmation of Joseph A. Saccomano, Jr., the Declaration of Tahira Mirza, MD, and the exhibits annexed thereto.[6]

---

[5] The Court notes for the record that, on October 5, 2021, Plaintiff filed a letter stating, "I am receiving some assistance from Frankfurt Kurnit Klein & Selz, P.C. ('FKKS') pursuant to a limited scope engagement. FKKS's role has been limited to responding to specific questions . . . . FKKS does not advise me on the substantive issues in this case, assist me with legal research, nor draft documents for me." (Doc. 125 at 1). The next day, October 6, 2021, FKKS filed a letter representing that the firm's "goal was, and has been, to assist this *pro se* litigant in limited ways in navigating the justice system, as Rule 1.2(c) [of the New York Rules of Professional Conduct] intended." (Doc. 126 at 1 (internal quotation marks omitted)).

[6] Plaintiff challenges a number of facts advanced in the 56.1 Counterstatement with citations to Bates Numbers without any reference to an Exhibit. Notably, none of the documents annexed to Plaintiff's declaration—except Exhibits 17 and 18—have Bates Numbers. In order to refute Defendants' proposed facts properly, Plaintiff was required to cite and submit admissible evidence for the Court's consideration. *See Wilson v. Annucci*, No. 18-CV-00391, 2020 WL 1979210, at *3 (N.D.N.Y. Apr. 23, 2020) (noting that *pro se* plaintiffs opposing a motion for summary judgment were "required to submit admissible evidence"), *adopted by* 2020 WL 5229375 (N.D.N.Y. Sept. 2, 2020); Local Civil Rule 56.1(d) ("Each statement by the movant or opponent pursuant to 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).."). Plaintiff did not comply with this requirement. Rather, with random citations to evidence that may or may not have been submitted to the Court, the Court is left to speculate about the documents to which Plaintiff refers. Notwithstanding the leniency afforded *pro se* litigants, Plaintiff "cannot simply dump . . . [papers] on the court and expect the court to sift through them to determine if some nugget is buried somewhere in that mountain . . . ." *Fontecchio v. ABC Corp.*, No. 12-CV-06998, 2015 WL 327838, at *9 n.13 (S.D.N.Y. Jan. 23, 2015) (quoting *Carmel v. CSH & C*, 32 F. Supp. 3d 434, 436 (W.D.N.Y. 2014)); *see also Sea Trade Mar. Corp. v. Coutsodontis*, No. 09-CV-00488, 2015 WL 4998638, at *4 (S.D.N.Y. Aug. 20, 2015) ("The Court declines to scour the numerous submissions and in effect become advocates for the Coutsodontis Defendants and their motion. Judges are not like pigs, hunting for truffles buried in briefs or the record." (cleaned up)). As such, statements in the 56.1 Counterstatement supported by admissible evidence and not refuted with citation to admissible evidence provided to the Court are deemed admitted. *Maersk Line A/S v. Carew*, No. 19-CV-04870, 2022 WL 602851, at *1 n.2 (S.D.N.Y. Mar. 1, 2022). The Court has, of course, confirmed that Defendants' assertions are supported by the record where Plaintiff disagrees. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001) ("Where . . . the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently.").

Based upon the parties' recitation of facts in their memoranda of law, there are very few disputed facts. (*Compare* Def. Br. at 2-6, *with* Opp. Br. at 3-6).

I.   Offer of Employment, Acceptance, and Challenges to Billing Practices

Plaintiff, a trauma surgeon, negotiated and executed an agreement ("Employment Agreement") after accepting a position as a Trauma and Acute Care Surgeon employed by Garnet Doctors and assigned to Garnet Medical Center. (56.1 CntrStmt. ¶ 7; *see also* Saccomano Aff., Ex. 4). Plaintiff's employment began on January 5, 2018. (56.1 CntrStmt. ¶ 28; *see also* Saccomano Aff., Ex. 4). Shortly thereafter, Plaintiff attended a New Provider Orientation that included a session on January 11, 2018 entitled, "Medical Group Revenue Cycle, Charge Capture & EPIC Billing" ("Billing Session"). (56.1 CntrStmt. ¶¶ 29-30; *see also* Saccomano Aff., Ex. 2 at 151:6-17; *id.*, Ex. 8 at Mirza00296). That module was led by Dr. Adrian Paraschiv ("Paraschiv"). (56.1 CntrStmt. ¶ 31; *see also* Saccomano Aff., Ex. 2 at 151:23-24; *id.*, Ex. 8 at Mirza00296).

Plaintiff maintains that Billing Coordinator D'Angela Ravenell ("Ravenell"), during the Billing Session, instructed the physicians present to use Code 99291 for all individuals presenting to the trauma emergency department. (56.1 CntrStmt. ¶ 32; *see also* Saccomano Aff., Ex. 1 at 112:5-113:20). Plaintiff, along with another surgeon, expressed their belief during that meeting that this instruction constituted Medicare fraud. (56.1 CntrStmt. ¶ 33; *see also* Saccomano Aff., Ex. 1 at 114:3-11, 125:17-20). Plaintiff testified to one specific instance where an incorrect code was used. (56.1 CntrStmt. ¶ 38; *see also* Saccomano Aff., Ex. 2 at 159:2-7).[7] In that particular

---

[7] Plaintiff, citing her deposition, disputes this fact because: (1) she identified the instruction on January 11, 2018; and (2) "the physician assistants used the incorrect . . . [code] in each patient medical record on a daily basis . . . ." (56.1 CntrStmt. ¶ 38). Even if her objection refuted Defendants' point (i.e., that she testified to only one specific event aside from the Billing Session)—and it does not—generalized claims do not create a genuine issue of fact. *See, e.g.*, *LaFever v. Clarke*, 525 F. Supp. 3d 305, 339 (N.D.N.Y. 2021) ("[E]ven viewing the additional facts offered by plaintiff in the light most favorable to her, they are too sparse and generalized to create a jury question on any of her claims."); *183 Bronx Deli Grocery Corp. v.*

case, on an unstated date and time, Plaintiff believed a chart she had worked on was improperly given to another doctor for billing and approval. (56.1 CntrStmt. ¶ 39; *see also* Saccomano Aff., Ex. 2 at 159:8-13).[8] Plaintiff notified the Medical Director, Dr. Mohammad Siddiqui ("Siddiqui"), and Ravenell, and Siddiqui told her to note in the chart that Plaintiff—not the other doctor—had seen the patient. (56.1 CntrStmt. ¶ 40; *see also* Saccomano Aff., Ex. 2 at 159:16-160:6).

Approximately two months after the Billing Session, Siddiqui notified Plaintiff that she had passed the Focus Professional Practice Evaluation, a benchmark required for all new surgeons before they can perform surgeries independently. (56.1 CntrStmt. ¶¶ 41-42, 44; *see also* Saccomano Aff., Ex. 1 at 97:4-22; *id.*, Ex. 2 at 162:11-24, 163:11-165:9). Around this time, Siddiqui told Plaintiff "that the administration was happy with her performance." (56.1 CntrStmt. ¶ 45). Indeed, Plaintiff testified as follows:

> Q. Did you ever get any feedback from any of them about your job performance?
>
> A. Yes, I did. Dr. Siddiqui told me in his office that the administration was very happy with our performance and that they had hired experienced – in our discussion we discussed that they had hired experienced surgeons, and so they were very happy with my performance.

(Saccomano Aff., Ex. 2 at 165:21-166:6).

---

*United States*, No. 11-CV-01527, 2012 WL 2359664, at *3 (S.D.N.Y. June 18, 2012) ("The non-movant cannot avoid summary judgment simply by asserting a metaphysical doubt as to the material facts, and may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." (internal citations and quotation marks omitted)).

[8] Although the parties provide no specific date for this event in the 56.1 Counterstatement, it appears—based upon the evidence provided by Plaintiff—that it occurred on or about February 12, 2018. (Mirza Decl., Ex. 15). Assuming that the event occurred on or about that date, upon being advised about the issue, Ravenell responded, "In other words [the other doctor] is falsely attesting that he independently performed a history and physical exam on this patient . . . . I will reach out to [Paraschiv] for IT instructions on how to delete or mark a note as erroneous." (*Id.* at 3).

II.    Complaint Regarding the May 22, 2018 Gallbladder Operation

Plaintiff, on or about May 24, 2018, received an e-mail from Garnet Medical Center's Quality Department about a laproscopic cholecystectomy that Plaintiff performed on May 22, 2018. (56.1 CntrStmt. ¶¶ 46, 47; *see also* Saccomano Aff., Ex. 2 at 167:23-172:9; Mirza Decl., Ex. 16 at 2-3). Siddiqui participated in the procedure. (Mirza Decl., Ex. 16 at 2 ("Dr. Siddiqui joined in the case/scrubbed in the procedure . . . .")).

After Plaintiff responded to the Quality Department's e-mail, she spoke with Siddiqui by telephone. (56.1 CntrStmt. ¶¶ 47-49; *see also* Saccomano Aff., Ex. 2 at 172:10-174:15, 208:21-209:11). Plaintiff also met in-person with Oxley on May 24, 2018 to discuss what happened during the procedure. (56.1 CntrStmt. ¶ 50; *see also* Saccomano Aff., Ex. 2 at 178:20-179:25). Plaintiff, during that meeting, told Oxley that Siddiqui had complained that Plaintiff ordered too many CAT scans. (56.1 CntrStmt. ¶ 51; *see also* Saccomano Aff., Ex. 2 at 190:2-191:4). Although Plaintiff insists that she also spoke directly with Siddiqui daily about practices she believed constituted improper patient care, there is no indication that Plaintiff complained specifically to Siddiqui's supervisors except for discussing CAT scans with Oxley on May 24, 2018. (56.1 CntrStmt. ¶¶ 52-53; *see also* Saccomano Aff., Ex. 2 at 190:6-191:4, 251:20-253:23).

III.    Two Days' Modified Responsibilities and Ensuing Resignation/Termination

On Thursday, June 1, 2018, Plaintiff had an in-person meeting with Siddiqui during which she was notified that the administration had concerns about her competency. (56.1 CntrStmt. ¶ 54; *see also* Saccomano Aff., Ex. 2 at 181:5-184:21).[9] Oxley, after that meeting, confirmed that Plaintiff was "[t]here for the long haul," and that he would speak with Siddiqui. (56.1 CntrStmt. ¶¶ 58-59; *see also* Saccomano Aff., Ex. 2 at 184:8-185:21, 187:17-188:12). Siddiqui called

---

[9] Plaintiff disputes that this meeting with Siddiqui was held in-person. (56.1 CntrStmt. ¶ 54). Her sworn testimony, however, suggests otherwise. (Saccomano Aff., Ex. 2 at 181:5-184:21).

Plaintiff later that day and instructed that if she received any calls during her next two on-call days—Friday and Saturday (June 2 and June 3, respectively)—she was to call a colleague to assist her in the operating room and was not permitted to act alone. (56.1 CntrStmt. ¶ 60; *see* Saccomano Aff., Ex. 2 at 191:19-193:7). As Plaintiff wrote in a June 2, 2018 e-mail to Oxley, Garnet Medical Center's Chief Executive Officer, Dr. Gerard Galarneau ("Galarneau"),[10] and Garnet Doctors' Executive Director, Jerry Dunlavey ("Dunlavey"), Siddiqui told her that the administration would render:

> a decision this Monday June 4th . . . regarding this matter and will proceed with either: i) restricting my privileges or ii) have some proctoring in place for me[; or] iii) terminate my employment.

(Saccomano Aff., Ex. 9; *see also* 56.1 CntrStmt. ¶ 62; Saccomano Aff., Ex. 2 at 195:8-17).

The next day, June 3, 2018, Plaintiff sent a letter to Galarneau stating, *inter alia*, that:

> It is with regret that I hereby submit my resignation for the Trauma Surgeon position at [Garnet Medical Center].
>
> . . . .
>
> I have been compelled to submit my resignation under duress as the facts below indicate that my employment contract with [Garnet Medical Center], which stated the duration of my employment as a two year term, was in effect intended to be for less than one year, and that [Garnet Medical Center] has presently decided to terminate my employment 5 months from the start of my contract, before the end of the 2 year contractual duration.
>
> It appears that the unwarranted and unjustified restrictions that were placed on my calls on June 2, 2018 and June 3, 2018, without due process and without giving me the opportunity to be heard, were done as a pretext to terminate my employment.
>
> . . . .

---

[10] Defendants assert that Galarneau was the Chief Executive Officer of Garnet Medical Center. (56.1 CntrStmt. ¶¶ 63, 71). Plaintiff both concedes the issue and objects to it, depending upon the context. (*Id.*). The Court notes that the initial offer letter sent by Garnet Doctors to Plaintiff identifies Galarneau not in connection with Garnet Medical Center, but, rather, identifies him as President of Garnet Doctors. (Saccomano Aff., Ex. 3 at Mirza00054). This discrepancy, to the extent one exists, is, however, immaterial.

> V. In addition, the nature of . . . the[] three potential outcomes that were communicated to me on June 1, 2018, inevitably indicates the impossibility of the continuation of my employment at [Garnet Medical Center]. This leaves me with no choice but to tender my resignation, because the communication of these three outcomes to me on June 1, 2018 in effect signifies that the Administration would like to terminate the employment agreement between myself and [Garnet Health] under . . . pretext . . . since the Administration has reached a conclusion of culpability . . . without due process, without informing me of what the issues are, and without hearing my account.

(Saccomano Aff., Ex. 10 at Mirza00016, Mirza00018; *see also* 56.1 CntrStmt. ¶ 71).[11]

Plaintiff met with Oxley, Galarneau, Siddiqui, and Dunlavey, on June 4, 2018. (56.1 CntrStmt. ¶ 73; *see also* Saccomano Aff., Ex. 2 at 231:21-232:4). Dunleavy, during that meeting, told Plaintiff that she was being terminated, without cause, under the Employment Agreement. (56.1 CntrStmt. ¶ 74; *see also* Saccomano Aff., Ex. 2 at 232:9-16; *id.*, Ex. 4 at Mirza00008). When Plaintiff asked what would be reported to future employers about her tenure, Dunlavey said that no reason for termination would be provided. (56.1 CntrStmt. ¶ 75; *see also* Saccomano Aff., Ex. 2 at 233:5-19). Dunlavey sent Plaintiff a letter that same day which read, in pertinent part:

> We have received your June 3, 2018 letter attempting to resign your "Trauma Surgeon position at [Garnet Medical Center]." Because you are not employed by [Garnet Medical Center] (your employment contract is with [Garnet Doctors]) and there is no provision in your January 5, 2018 Physician Employment Agreement with [Garnet Doctors] (the "Agreement") that allows you to terminate immediately under any circumstances, your June 3, 2018 letter has no effect.

---

[11] Plaintiff insists, citing "the June 2, 2018[] emails, and [her] resignation letter," that Siddiqui and Galarneau "instructed" her to resign. (Opp. Br. at 15). These documents do not, however, support the idea that Plaintiff was forced to resign. Rather, they indicate that after Plaintiff expressed dissatisfaction with the temporary limitation on her surgical duties, she was offered the option of resigning. (*See* Saccomano Aff., Ex. 9 at Mirza00248 (e-mail sent at 8:24 a.m. on June 2, 2018 from Plaintiff to Oxley, Galarneau, and Dunlavey stating, *inter alia*, "[i]f the administration has reached a decision to terminate the employment agreement, I would prefer to resign"); Mirza Decl., Ex. 9 (e-mail sent at 9:37 a.m. on June 2, 2018 from Siddiqui to Plaintiff advising, "[a]fter discussion with Dr. Galarneau[,] you are allowed to offer your resignation with immediate effect")).

> However, after careful consideration, [Garnet Doctors] has decided to terminate the Agreement without cause pursuant to Section 7.2 of the Agreement. [Garnet Doctors] is exercising its option under Section 7.2 to terminate the Agreement without cause immediately and continue to pay your base salary for ninety (90) days.

(Saccomano Aff., Ex. 11; *see also* 56.1 CntrStmt. ¶ 77).[12]

## IV.   Employment Verification

Sometime later in 2018—after the events described above—Plaintiff accepted a position at a hospital in Kissimmee, Florida. (56.1 CntrStmt. ¶¶ 80-81; *see also* Saccomano Aff., Ex. 1 at 133:4-135:3). After accepting the position, as part of that onboarding process, Parallon Credentialing Processing Center ("Parallon"), a third-party credentialing firm, contacted Garnet Medical Center to confirm Plaintiff's employment and obtain information about her performance. (56.1 CntrStmt. ¶¶ 82-83; *see also* Saccomano Aff., Ex. 2 at 239:8-22; *id*., Ex. 12). Parallon sent this request at Plaintiff's direction and, included with the request, an Authorization, Attestation and Release ("Release") executed by Plaintiff on December 5, 2018. (56.1 CntrStmt. ¶ 85; *see also* Saccomano Aff., Ex. 2 at 239:8-13, 243:17-22; *id*., Ex. 12 at Mirza00487).

Oxley responded to the request with a copy of Plaintiff's final evaluation. (56.1 CntrStmt. ¶¶ 88-89; *see also* Saccomano Aff., Ex. 2 at 238:14-242:15; *id*., Ex. 12 at Mirza00484-85). That evaluation noted Oxley's assessment that Plaintiff was "qualified and competent with some reservation." (56.1 CntrStmt. ¶ 91; *see also* Saccomano Aff., Ex. 12 at Mirza00485). Plaintiff did not ultimately secure the Florida position. (*See* 56.1 CntrStmt. ¶¶ 94-95; *see also* Saccomano Aff., Ex. 2 at 247:4-17).

This litigation followed.

---

[12] Any notices under the Employment Agreement were to be addressed to Garnet Doctors (to Dunlavey's attention, specifically), with a copy to Garnet Health. (Saccomano Aff., Ex. 4 at Mirza00011).

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, 442 F. Supp. 3d 714, 722 (S.D.N.Y. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-05486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id*. (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence; the task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial . . . ." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)). Claims simply cannot proceed in the absence of sufficient proof as to an essential element.

"It is the movant's burden to show that no genuine factual dispute exists," *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)), and a court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id*. (citing *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come

forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 442 F. Supp. 3d at 722 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts . . . ." *Id.* (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, "[i]f there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must establish also its "entitlement to judgment as a matter of law." *In re Davis New York Venture Fund Fee Litig.*, 805 F. App'x 79, 80 (2d Cir. 2020) (quoting *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019)). Stated simply, the movant must establish that the law favors the judgment sought. *Gonzalez v. Rutherford Corp.*, 881 F. Supp. 829, 834 (E.D.N.Y. 1995) (explaining "that summary judgment is appropriate only when . . . law supports the moving party"); *Linares v. City of White Plains*, 773 F. Supp. 559, 560 (S.D.N.Y. 1991) (explaining that summary judgment is appropriate when "the law so favors the moving party that entry of judgment in favor of the movant dismissing the complaint is proper").

The Court is, of course, mindful that "[*p*]*ro se* litigants are afforded a special solicitude," which includes reading their filings "to raise the strongest arguments they suggest." *Mortimer v. City of New York*, No. 15-CV-07186, 2018 WL 1605982, at *9 (S.D.N.Y. Mar. 29, 2018) (internal quotation marks omitted). "It is through this lens of leniency towards *pro se* litigants that this Court must consider a defendant's motion for summary judgment against a *pro se* plaintiff." *Adams v. George*, No. 18-CV-02630, 2020 WL 5504472, at *5 (S.D.N.Y. Sept. 8, 2020). This status does

not, however, excuse a *pro se* litigant from making the showing required to defeat summary judgment; he or she must offer more than "bald assertions, completely unsupported by evidence" to overcome the motion. *Wisdom v. Loiodice*, No. 17-CV-04837, 2020 WL 4431590, at *4 (S.D.N.Y. July 31, 2020); *see also Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (explaining that the mere fact that a litigant is *pro se* "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment" (internal quotation marks omitted)); *Ross v. Koenigsmann*, No. 14-CV-01321, 2017 WL 9511096, at *1 (N.D.N.Y. Aug. 16, 2017), *adopted sub nom. Ross v. Mannava*, 2017 WL 4338883 (N.D.N.Y. Sept. 29, 2017).

## <u>ANALYSIS</u>

Defendants seek summary judgment on each of Plaintiff's seven claims for relief. The Court addresses the claims *seriatim*.

### I.   <u>First and Second Claims for Relief: FCA and NYFCA Retaliation</u>

Plaintiff's first claim for relief, FCA retaliation, is based on a statute enacted by Congress "in response to the disclosure of widespread fraud by defense contractors during the Civil War." *Swanson v. Battery Park City Auth.*, No. 15-CV-06938, 2016 WL 3198309, at *2 (S.D.N.Y. June 8, 2016) (internal quotation marks omitted). Plaintiff's second claim for relief relies on the FCA's New York State counterpart, which was "closely modeled" on its federal predecessor and enacted in April 2007. *Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 381 (S.D.N.Y. 2015) (internal quotation marks omitted). These two claims for relief rise and fall together, as they require the same elements to state a claim. *See Dhaliwal v. Salix Pharms., Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019) ("Additionally, because '[t]he NYFCA follows the federal False Claims Act,' New York courts 'look toward federal law when interpreting the New York act.'" (quoting *State ex rel. Seiden v. Utica First Ins.*, 943 N.Y.S.2d 36, 39 (App. Div. 2012) (alteration in original)).

Under the FCA and NYFCA, retaliation requires Plaintiff to show that:

> (1) [she] engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against [her] because [she] engaged in the protected activity.

*Id.* at 100 (quoting *United States ex rel. Chroches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017)); *see also Kall v. Peekskill City Sch. Dist.*, No. 18-CV-10199, 2020 WL 2555256, at *5 (S.D.N.Y. May 19, 2020); *Shi v. Moog, Inc.*, No. 19-CV-00339, 2020 WL 5668979, at *2 (W.D.N.Y. Sept. 24, 2020). Claims under these statutes are evaluated under the familiar *McDonnell Douglas Corp.* three-step burden-shifting test. *See Plotzker v. Kips Bay Endoscopy Ctr., LLC*, No. 12-CV-09255, 2017 WL 4326061, at *7 (S.D.N.Y. Sept. 8, 2017) ("Although not squarely addressing the issue, the Second Circuit has implicitly endorsed the application of the *McDonnell Douglas* framework to Section 3730(h) claims." (internal quotation marks omitted)), *aff'd sub nom. Plotzker v. Kips Bay Anesthesia, P.C.*, 745 F. App'x 436 (2d Cir. 2018); *see also Lavalette v. Ion Media Networks, Inc.*, No. 16-CV-07286, 2019 WL 3409899, at *9 (S.D.N.Y. July 29, 2019). Therefore:

> [i]f Plaintiff produces evidence sufficient to support a *prima facie* case for retaliation, the burden shifts to Defendants to produce evidence of a non-discriminatory reason for [their] actions, following which the burden shifts back to Plaintiff to show that Defendants' stated reason is a pretext for retaliation.

*Lavalette*, 2019 WL 3409899, at *9 (internal quotation marks omitted); *see also Plotzker*, 2017 WL 4326061, at *7.

A. <u>The Employer</u>

Plaintiff, at the first step, can only state these claims against her employer. *Taylor v. New York State Off. for People with Dev. Disabilities*, No. 13-CV-00740, 2014 WL 1202587, at *10 (N.D.N.Y. Mar. 24, 2014). Plaintiff insists that each Corporate Defendant was her employer. (Opp.

14

Br. at 8; *see also* 56.1 CntrStmt. ¶ 72). The admissible evidence, however, does not support that argument. The Employment Agreement, executed by Plaintiff, provides as follows in the first section on the first page:

> Subject to the terms and conditions set forth in this Agreement, [Garnet Doctors] hereby employs the Physician, and the Physician agrees to be employed by [Garnet Doctors] . . . .

(Saccomano Aff., Ex. 4 at Mirza00001). This contract, governed by New York State law without regard to conflicts or choice of law principles, makes clear that Garnet Doctors was Plaintiff's employer. (*Id.* at Mirza00010); *see also Intelligent Digital Sys., LLC v. Beazley Ins. Co., Inc.*, 716 F. App'x 1, 3 (2d Cir. 2017) (explaining that, under New York law, "[t]he court must interpret the contract to give effect to the intent of the parties as expressed in the clear language of the contract, and give words and phrases in the contract their plain meaning" (internal citations and quotation marks omitted)). The Court, therefore, rejects Plaintiff's argument that she was, in actuality, also an employee of Garnet Doctors' corporate parent or affiliates.[13]

These claims are, therefore, dismissed as against Garnet Health and Garnet Medical Center because Plaintiff cannot state a *prima facie* claim against those entities.

---

[13] Plaintiff insists, with citation to a website, that Garnet Doctors "was not [her] exclusive employer," and that she was also employed by the corporate parent, Garnet Health, and the affiliate, Garnet Medical Center. (Opp. Br. at 8). Even if the Court disregarded the language of the Employment Agreement and addressed these arguments, Plaintiff provides no admissible evidence suggesting that anybody but Garnet Doctors was her employer and, therefore, presents no genuine issue of material fact to oppose Defendants' argument on this point. *See Dinkins v. New York*, No. 19-CV-08447, 2021 WL 3173968, at *10 (S.D.N.Y. July 26, 2021) ("[C]onclusory, speculative, baseless, and unsubstantiated statements are insufficient to defeat . . . [a] motion for summary judgment.); *cf. Fenner v. News Corp.*, No. 09-CV-09832, 2013 WL 6244156, at *9 (S.D.N.Y. Dec. 2, 2013) (describing the single employer doctrine at summary judgment in an employment discrimination case and explaining that that "'[t]he law only treats the employees of a corporate entity as the employees of a related entity under extraordinary circumstances,' just as the law only pierces the veil of a corporate entity under extraordinary circumstances. (quoting *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996)).

B.  The Protected Activity

Having concluded that Plaintiff's FCA and NYFCA retaliation claims can proceed against Garnet Doctors only, the Court turns to the substantive elements of the *prima facie* case. Looking first to the requirement that Plaintiff engage in protected activity, that concept is interpreted broadly and "encompasses two kinds of conduct: (1) lawful acts done by the employee . . . in furtherance of an action under the [statutes], and (2) other efforts to stop one or more violations of the [statutes]." *Koshy v. Regeneron Pharms., Inc.*, No. 17-CV-07781, 2019 WL 6895563, at *5 (S.D.N.Y. Dec. 18, 2019) (internal quotation marks omitted); *see also United States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 298 (E.D.N.Y. 2016) (explaining that retaliation claims require a plaintiff to "demonstrate that [she] had been investigating matters that were calculated, or reasonably could have [led], to a viable . . . action" under those laws (quoting *United States v. Empire Educ. Corp.*, 959 F. Supp. 2d 248, 256 (N.D.N.Y. 2013) (second alteration in original))); *U.S. ex rel. Sasaki v. New York Univ. Med. Ctr.*, No. 05-CV-06163, 2012 WL 220219, at *12 (S.D.N.Y. Jan. 25, 2012) ("Protected activity is interpreted broadly. Furthermore, a relator need not prevail on his or her . . . claim in order to recover for retaliation . . . ." (internal citation and quotation marks omitted)), *aff'd sub nom. ABC v. NYU Hosps. Ctr.*, 629 F. App'x 46 (2d Cir. 2015); *U.S. ex rel. Quartararo v. Catholic Health Sys. of Long Island Inc.*, 521 F. Supp. 3d 265, 279 (E.D.N.Y. 2021) (explaining that a plaintiff "need not prove" an actual violation to "succeed on the retaliation claim"); *Kall*, 2020 WL 2555256, at *6. The conduct must, however, "be 'directed at exposing a fraud upon the government.'" *Fisch v. New Heights Acad. Charter Sch.*, No. 12-CV-02033, 2012 WL 4049959, at *5 (S.D.N.Y. Sept. 13, 2012) (quoting *MoorJankowski v. Bd. of Trustees of New York Univ.*, No. 96-CV-05997, 1998 WL 474084, at *10 (S.D.N.Y. Aug. 10, 1998)); *Anonymous v. Anonymous*, 83 N.Y.S.3d 472, 480 (App. Div. 2018) (quoting *Garcia v.*

*Aspira of N.Y., Inc.*, No. 07-CV-05600, 2011 WL 1458155, at *4 (S.D.N.Y. Apr. 13, 2011)); N.Y. Fin. Law § 191(2) (explaining that "lawful" (i.e., protected) acts "shall include, but not be limited to, obtaining or transmitting to the state . . . documents, data . . . for the sole purpose of furthering efforts to stop one or more violations . . . .").

In addition to establishing conduct directed at exposing fraud, "a plaintiff is required to show a good faith basis, or objectively reasonable basis, for believing that he or she was investigating matters in support of a viable" false claims case. *New York ex rel. Khurana v. Spherion Corp.*, 511 F. Supp. 3d 455, 473 (S.D.N.Y. 2021) (quoting *Swanson*, 2016 WL 3198309, at *3). This introduces a *mens rea* evaluation and requires evidence that: "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Id.* (quoting *Ortiz v. Todres & Co.*, No. 15-CV-01506, 2019 WL 1207856, at *4 (S.D.N.Y. Mar. 14, 2019)).

The record reveals only two specific actions Plaintiff took to prevent what she describes as "fraudulent activity." First, during the Billing Session, Plaintiff expressed her opinion that the practice described—i.e., using Code 99291—was fraudulent. (56.1 CntrStmt. ¶¶ 32-33; *see also* Saccomano Aff., Ex. 1 at 112:5-114:11, 125:12-20). Then, at some point, she raised an issue about an incorrect chart and billing approval to Ravenell and Siddiqui (who, in turn, explained how to rectify the error). (56.1 CntrStmt. ¶¶ 38-40; *see also* Saccomano Aff., Ex. 2 at 159:2-160:6). [14]

---

[14] Plaintiff makes generalized claims that she "[a]lmost on a daily basis . . . complained about . . . billing under code 99291," complained "frequently about . . . keeping patients in the hospital for additional days . . . in violation of Medicare rules," consistently "objected to Defendants' violations of Medicare's 'two-night' and 'three-day' rules," and more. (*See* Opp. Br. at 9-13). Vague assertions, not based on any admissible evidence aside from Plaintiff's own equally unspecific testimony, are insufficient to generate a genuine issue of material fact. *See Wrobel v. Cty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) ("To survive a motion under Rule 56(c), Wrobel needed to create more than a metaphysical possibility that his allegations were correct; he needed to come forward with specific facts showing that there is a *genuine issue for trial.*" (internal quotation marks omitted, emphasis in original)); *Viera v. Lepkowski*, No. 17-CV-06844, 2022 WL

Here, the purported protected activities fail on all grounds. Plaintiff has submitted no evidence to substantiate her subjective conclusions of fraud—let alone an objective belief of fraud—and, with respect to the chart error specifically, she was advised on how to correct it. Moreover, none of this conduct was "directed at exposing a fraud upon the government." At best, these interactions suggest that Plaintiff once expressed her opinion that a billing practice was improper and once had to rectify an error. These acts are a far cry from acts aimed at "exposing fraud upon the government." *See generally Koshy*, 2019 WL 6895563, at *6 (observing that simply "grumbling to the employer about . . . regulatory violations does not constitute protected activity" (internal quotation marks omitted)); *Ortiz*, 2019 WL 1207856, at *4 (noting that "an employee's activities that are not related to exposing or deterring fraud, are not whistleblowing" (internal quotation marks omitted)); *Lawrence v. Int'l Bus. Mach. Corp.*, No. 12-CV-08433, 2017 WL 3278917, at *6 (S.D.N.Y. Aug. 1, 2017) (explaining that "'[m]ere investigation of an employer's non-compliance with federal regulations is not enough' to constitute protected activity" (quoting *Fisch*, 2012 WL 4049959, at *5); *see also Spherion Corp.*, 511 F. Supp. 3d at 475 ("[W]hen otherwise protected activity constitutes part of a . . . plaintiff's normal job responsibilities, the plaintiff must demonstrate that [her] activity went beyond the performance of [her] normal job responsibilities . . . ." (internal quotation marks omitted)).

As Plaintiff has failed to present admissible evidence establishing that she engaged in a protected activity under the FCA or NYFCA, the claims for relief are dismissed on this basis.

---

138540, at *3 (W.D.N.Y. Jan. 14, 2022) ("[T]he non-moving party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." (internal quotation marks omitted)); *Walker v. Carter*, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016) ("As a general matter, a nonmoving party's self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment." (internal quotation marks omitted)).

However, even if Plaintiff had identified protected activity, the claims for relief would still fail at the *prima face* stage for at least two other reasons.

        C.  <u>The Adverse Action</u>

        Assuming that Plaintiff engaged in a protected activity, she must identify an adverse action. While "[t]he Second Circuit has not defined 'adverse action' in the context of an FCA retaliation claim," courts commonly apply the Title VII definition. *Dhaliwal v. Salix Pharms., Ltd.*, No. 15-CV-00706, 2019 WL 5067164, at *4 (S.D.N.Y. Oct. 9, 2019); *see also U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 326 (5th Cir. 2016) (applying Title VII standard to an FCA retaliation claim); *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 434 (4th Cir. 2015) (same); *Moore v. California Inst. of Tech. Jet Propulsion Lab'y*, 275 F.3d 838, 847-48 (9th Cir. 2002) (agreeing with the proposition that "behavior does not constitute retaliation under the [FCA] . . . unless it would be sufficient to constitute an adverse employment action under Title VII"); *Spherion Corp.*, 511 F. Supp. 3d at 477-79 (determining whether plaintiff endured adverse action in an FCA and NYFCA case, after a bench trial, relying on Title VII standard of adverse action). Therefore, to qualify as an adverse action, Plaintiff must "endure[] a materially adverse change in the terms and conditions of employment." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). That means that the action must have been "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id*. (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id*. at 85 (quoting *Terry*, 336 F.3d at 138). However, "without more, an employer's

criticisms or negative evaluations of an employee's performance do not . . . [qualify], nor do everyday workplace grievances, disappointments, and setbacks." *Belton v. Borg & Ide Imaging, P.C.*, 512 F. Supp. 3d 433, 442 (W.D.N.Y. 2021) (internal citations and quotation marks omitted).

Against this background, the bulk of supposed adverse actions Plaintiff identifies—the May 2018 complaint, the meetings, the two-day restrictions on her surgical duties, and the post-employment conduct (*see* Opp. Br. at 15-18)—are not adverse actions because they did not materially and adversely change the terms of her employment. *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567-72 (2d Cir. 2011); *Moschetti v. New York City Dep't of Educ.*, No. 15-CV-03161, 2018 WL 4759787, at *14 (S.D.N.Y. Sept. 28, 2018) ("Even if Plaintiff found the post-observation conference unnecessarily harsh and critical . . . '[i]t hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action.'" (quoting *Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 619 (S.D.N.Y. 2009)), *aff'd*, 778 F. App'x 65 (2d Cir. 2019); *Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 329 (S.D.N.Y. 2020) (noting, generally, "that temporary transfers do not constitute adverse employment actions" (internal quotation marks omitted)); *Collazo v. Cty. of Suffolk*, 163 F. Supp. 3d 27, 53 (E.D.N.Y. 2016) (increased supervision, without "unfavorable consequences" caused thereby, is not an adverse employment action); *Brown v. CSX Transp. Inc.*, 155 F. Supp. 3d 265, 271 (W.D.N.Y. 2016) (requiring training is not an adverse employment action); *Freeman v. Dep't of Env't Prot.*, No. 10-CV-01555, 2013 WL 817221, at *5 (E.D.N.Y. Feb. 5, 2013) ("[C]ourts in this circuit have regularly held that *temporary* reassignments which do not impact an employee's salary or benefits do not constitute an adverse employment action." (emphasis in original)), *adopted by* 2013 WL 801684 (E.D.N.Y. Mar. 5, 2013); *Lucenti v. Potter*, 432 F. Supp. 2d 347, 364 (S.D.N.Y. 2006)

("Reprimands, threats of disciplinary action, and excessive scrutiny do not constitute adverse employment actions."); *see also Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 317 n.9 (S.D.N.Y. 2015) ("[T]he FCA does not provide a remedy for post-employment retaliation."), *aff'd*, 626 F. App'x 20 (2d Cir. 2015).

The only remaining potentially adverse action Plaintiff identifies—her termination—would, generally, qualify as an adverse employment action. *See Forkell v. Lott Assisted Living Corp.*, No. 10-CV-05765, 2012 WL 1901199, at *11 n.8 (S.D.N.Y. May 21, 2012) ("[T]ermination clearly constitutes adverse action."); N.Y. State Fin. Law. § 191(1) (creating a cause of action for employees "discharged" or "suspended" because of protected activity). Plaintiff insists, however, that she was *constructively discharged* because she resigned before termination. (Opp. Br. at 15-17). That narrative alters what would otherwise presumably qualify as an adverse action because:

> [c]onstructive discharge claims require "the employee to show both (1) that there is evidence of the employer's intent to create an intolerable environment that forces the employee to resign, and (2) that the evidence shows that a reasonable person would have found the work conditions so intolerable that he would have felt compelled to resign."

*United States v. N. Metro. Found. for Healthcare, Inc.*, No. 13-CV-04933, 2019 WL 1597296, at *13 (E.D.N.Y. Apr. 14, 2019) (quoting *Makinen v. City of New York*, 722 F. App'x 50, 52 (2d Cir. 2018)). This is a "demanding standard." *Id*. (quoting *Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010)). Although Plaintiff argues in her opposition brief that she was forced to resign, she: (1) provides no admissible evidence substantiating the idea that anybody intended to force her to resign (in fact, as noted *supra*, evidence suggests she was offered the option of resigning after asking for that ability); and (2) does not explain how a reasonable surgeon would have found the working conditions intolerable enough to "compel" resignation. (*See* Opp. Br. at 15-17).

21

Consequently, even if Plaintiff substantiated a protected activity, the claims for relief would still fail because she presents no argument or admissible evidence establishing a genuine issue of material fact as to an adverse action. This failure constitutes a second, independent basis for dismissing these claims for relief, which the Court adopts.

Of course, the argument could be made that—notwithstanding Plaintiff's insistence that she was constructively discharged and not terminated—the undisputed facts reveal that she was, in fact, terminated. There are two problems with this argument. First, the Court cannot invent arguments Plaintiff has not advanced. *See Smith v. Mumm*, No. 17-CV-06344, 2020 WL 1557407, at *3 n.3 (W.D.N.Y. Apr. 1, 2020) ("The Court recognizes that it has a responsibility to liberally construe *pro se* pleadings. Nevertheless, this responsibility is not without limits, and it is not the Court's role to create new arguments on a *pro se* litigant's behalf (particularly when such arguments would be contrary to the litigant's explicit concessions and arguments)."). Second, even if Plaintiff adopted the position that she was terminated—and that her termination therefore constituted an adverse action—the point would be moot because the claims for relief would still fail for at least the reasons discussed herein.

   D.   The Causal Connection

Assuming that Plaintiff established a protected activity and an adverse action, she was required to produce admissible evidence showing "but-for" causation between them—that is, Plaintiff had to show that the action was taken *because of* the activity. *Dhaliwal*, 752 F. App'x at 102; *see also Beckles-Canton v. Lutheran Soc. Servs. of New York, Inc.*, No. 20-CV-04379, 2021 WL 3077460, at *8 (S.D.N.Y. July 20, 2021) ("While the Second Circuit has not addressed the appropriate causation standard for FCA retaliation claims, a number of courts in this District have employed a 'but-for' causation standard . . . ." (internal citation omitted)); *Malanga v. New York*

22

*Univ.*, No. 14-CV-09681, 2018 WL 333831, at *4 (S.D.N.Y. Jan. 9, 2018) ("[T]his Court joins the chorus of courts recognizing a 'but-for' causation standard under the FCA.").

Plaintiff, on this element, relies on temporal proximity. (Opp. Br. at 18-19). This argument fails on two fronts. First, she argues that "[t]ill the end of [her] employment, [she] was engaging in a protected activity," which is another reference to her generalized insistence that she was daily correcting what she characterizes as "fraudulent" practices. (*Id*. at 18). This argument is self-defeating: even if the argument was not impermissibly generalized and vague, the fact that Plaintiff claims that she was consistently engaging in a protected activity would "render[] unremarkable any temporal connection between any particular" protected activity and adverse action. *U.S. ex rel. O'Toole v. Cmty. Living Corp.*, No. 17-CV-04007, 2020 WL 2512099, at *12 (S.D.N.Y. May 14, 2020) (quoting *McCallan v. Von Essen*, 517 F. Supp. 2d 672, 683 (S.D.N.Y. 2007)). Second, giving Plaintiff the benefit of every inference to which she is entitled as a *pro se* non-movant, even if the Court considered the temporal proximity between the Billing Session and her termination, timing would not establish causation because more than four months separate the events, and "courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." *Rightnour v. Tiffany & Co.*, 354 F. Supp. 3d 511, 527 (S.D.N.Y. 2019) (quoting *Avillan v. Donahoe*, No. 13-CV-00509, 2015 WL 728169, at *15 (S.D.N.Y. Feb. 19, 2015)).[15]

---

[15] This result would be the same with respect to the incident regarding the incorrect chart because the date is either: (1) unknown; or (2) on or about February 12, 2018. In the former scenario, no temporal proximity argument survives without a starting date. *See Reyes v. Westchester Cty. Health Care Corp.*, No. 19-CV-08916, 2021 WL 310945, at *12 (S.D.N.Y. Jan. 29, 2021) ("Having failed to specify when Plaintiff complained to Human Resources, the Court cannot infer a connection based on temporal proximity."), *aff'd*, No. 21-0410, 2021 WL 4944285 (2d Cir. Oct. 25, 2021). In the latter scenario, the events would still be separated by more than three months.

Plaintiff's failure to present admissible evidence substantiating a causal link between a protected activity and an adverse action—separate necessary elements which, as explained *supra*, Plaintiff has not established—supplies another basis to dismiss the FCA and NYFCA retaliation claims, which the Court adopts.

II.  Third Claim for Relief: N.Y. Labor Law § 741[16]

Plaintiff's third claim for relief proceeds under "[t]he so-called health care whistleblower law," N.Y. Labor Law § 741. 53 N.Y. Jur. 2d Employment Relations § 587. That statute is "intended to protect health care workers who complain about unsafe medical practices." *Trivelli v. Putnam Hosp. Ctr.*, No. 19-CV-09898, 2020 WL 7246904, at *9 (S.D.N.Y. Dec. 9, 2020) (quoting *Mayer v. Neurological Surgery, P.C.*, No. 15-CV-00864, 2016 WL 347329, at *3 (E.D.N.Y. Jan. 28, 2016)). Section 741 prohibits "retaliatory action against any employee" who:

> (a) discloses or threatens to disclose to a supervisor, to a public body, to a news media outlet, or to a social media forum available to the public at large, an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care or improper quality of workplace safety; or
>
> (b) objects to, or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care or improper quality of workplace safety.

N.Y. Lab. Law § 741(2). Defendants' motion for summary judgment on this claim for relief must be granted for one very simply reason: Plaintiff has not presented admissible evidence of behavior "constitut[ing] improper quality of patient care."

---

[16] Defendants argue that, if the Court dismisses the FCA retaliation claim, the remaining claims for relief should be dismissed for lack of subject-matter jurisdiction. (Def. Br. at 17). Defendants do not address, however, how dismissal of the FCA retaliation claim destroys subject-matter jurisdiction given that Plaintiff also invoked this Court's diversity jurisdiction. (*See* FAC ¶¶ 5-6).

The statute pertains to disclosure of—or objection to—any activity that "the employee, in good faith, reasonably believes constituted improper quality of patient care . . . ." (*Id.*). The operative phrase, "improper quality of patient care," is defined as:

> any practice, procedure, action or failure to act of an employer which violates any law, rule, regulation or declaratory ruling adopted pursuant to law, where such violation relates to matters which may present a substantial and specific danger to public health or safety or a significant threat to the health of a specific patient.

N.Y. Lab. Law § 741(1)(d).

At summary judgment, Plaintiff must identify, specifically, the "law, rule, regulation or declaratory ruling" Defendants violated; because she has failed to do so, this claim for relief must be dismissed. *See Luiso v. N. Westchester Hosp. Ctr.*, 886 N.Y.S.2d 216, 217 (App. Div. 2009) (affirming summary judgment where the plaintiff "was unable to cite any law, rule, regulation or declaratory ruling adopted pursuant to law" that she believed was violated); *see also Duarte v. St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 355 (S.D.N.Y. 2017) ("[C]omplaints about financial wrongdoing or fraudulent billing generally fall outside the ambit of the Whistleblower Law, unless a plaintiff demonstrates that the illegal activity concomitantly creates substantial and specific danger to the public health and safety." (internal citations and quotation marks omitted)); *Bordell v. Gen. Elec. Co.*, 667 N.E.2d 922, 923 (N.Y. 1996); *Ulysse v. AAR Aircraft Component Servs.*, 131 N.Y.S.3d 609, 610 (App. Div. 2020).

Accordingly, Plaintiff's third claim for relief is dismissed.

III.   <u>Remaining Claims for Relief</u>

The four remaining state law claims for relief—breach of contract, promissory estoppel, defamation/libel *per se*, and tortious interference with prospective business relationship—all stem from the information provided to Parallon in connection with Plaintiff's application to work at a hospital in Kissimmee, Florida. (*See* FAC ¶¶ 418-67). Plaintiff testified that she had no evidence

establishing that Oxley's response to Parallon's request was responsible for her failure to ultimately secure the Florida position. (56.1 CntrStmt. ¶¶ 94-95; see also Saccomano Aff., Ex. 2 at 247:4-17). In any event, these claims for relief are barred by the Release that Plaintiff executed, which provided, in pertinent part:

> I authorize any third party, including, but not limited to, individuals, agencies, medical groups responsible for credentials verification, corporations, companies, employers, former employers, hospitals . . . to release to the Entity and/or its Agent(s), information, including otherwise privileged or confidential information, concerning my professional qualifications, credentials, clinical competence, quality assurance and utilization data, character, mental condition, physical condition . . . ethics, behavior, or any other manner reasonably having a bearing on my qualifications for Participation in, or with, the Entity. I specifically waive written notice from any entities and individuals who provide information based upon this Authorization, Attestation and Release.
>
> . . . .
>
> I extend absolute immunity to, and release from any and all liability any Entity, its Agent(s), and any other third party for their acts performed in connection with the gathering, release and exchange of, and reliance upon, information used in accordance with this Authorization, Attestation and Release. I further agree not to sue any Entity, any Agent(s), or any other thirty party for their acts, defamation or any other claims based on statements made in good faith without malice or misconduct of such Entity, Agent(s) or third-party in connection with the credentialing process. The release shall be in addition to, and in no way shall limit, any other applicable immunities provided by law for peer review and credentialing activities. In this Authorization, Attestation and release, all references to the Entity, its Agent(s), and/or other third-party include their respective employees, directors, officers, advisors, counsel, and agents.

(Saccomano Aff., Ex. 12 at Mirza00486-87; see also 56.1 CntrStmt. ¶¶ 86-87).

"A release is a species of contract and is governed by principles of contract law." *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 514 (2d Cir. 2001) (internal quotation marks omitted). Therefore, when a release is unambiguous, a court must enforce its plain meaning. *CreditSights,*

*Inc. v. Ciasullo*, No. 05-CV-09345, 2008 WL 4185737, at *8 (S.D.N.Y. Sept. 5, 2008); *see also Keady v. JP Morgan Chase & Co.*, 328 F. App'x 23, 24 (2d Cir. 2009) ("A release 'must be construed in accordance with the intent of the parties who executed it,' and will be given effect only if it 'contains an explicit, unequivocal statement of a present promise to release [a party] from liability.'" (quoting *Golden Pac. Bancorp*, 273 F.3d at 515 (alteration in original)). "[A] valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011) (internal quotation marks omitted). *Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 685 (2d Cir. 1983) ("To establish waiver under New York law one must show that the party charged with waiver relinquished a right with both knowledge of the existence of the right and an intention to relinquish it.").

The language of the Release is clear and unambiguous. Plaintiff "extend[ed] absolute immunity" to Defendants "for their acts performed in . . . release and exchange of" the information requested. (Saccomano Aff., Ex. 12 at Mirza00487). Indeed, Plaintiff represented that she would "not sue . . . for their acts, defamation or any other claims *based on statements made* in good faith and without malice . . . ." (*Id.* (emphasis added)). Each of the remaining claims rely on the information provided to Parallon and are, therefore, barred by the Release. *See Huntemann v. City of Yonkers*, No. 95-CV-01276, 1997 WL 527880, at *11 (S.D.N.Y. Aug. 25, 1997) (concluding that plaintiff "waived any claims that he might have regarding statements made" by his former employer in connection with background investigations where the plaintiff executed forms authorizing the release of information); *see also Deaton v. Napoli*, No. 17-CV-04592, 2019 WL 4736722, at *9 (E.D.N.Y. Sept. 27, 2019) (finding tortious interference with prospective business relationship claim duplicative of defamation claim "where the injury complained of by plaintiff

flows from the effect on his reputation" (internal quotation marks omitted)). Although Plaintiff argues that Oxley's statements were actionable because they were made with malice, she neither cites nor submits admissible evidence to support that position in her two-sentence response to the argument. (Opp. Br. at 23); *see, e.g.*, *LaFever*, 525 F. Supp. 3d at 339; *Dinkins*, 2021 WL 3173968, at *10; *183 Bronx Deli Grocery Corp.*, 2012 WL 2359664, at *3.

As the Release shields Defendants from any liability for the acts for which Plaintiff sues, the remaining common law claims for relief are dismissed on that basis.

## **CONCLUSION**

In light of the foregoing, Defendants' motion for summary judgment is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion sequence pending at Doc. 93 and close this case.

**SO ORDERED:**

Dated:    White Plains, New York
          March 17, 2022

_____
PHILIP M. HALPERN
United States District Judge

28